805 A.2d 476

The PENNSYLVANIA SCHOOL BOARDS ASSOCIATION, INC., the Philadelphia School District, and David Hornbeck, Superintendent of the Philadelphia School District, Appellees

v.

COMMONWEALTH ASSOCIATION OF SCHOOL ADMINISTRATORS, Teamsters Local 502, Appellant.

Matthew J. Ryan, Speaker of the Pennsylvania House of Representatives and Robert C. Jubelirer, President Pro Tempore of the Pennsylvania Senate, Intervenors.

Supreme Court of Pennsylvania.

Argued Oct. 16, 2000.

Decided July 16, 2002.

438

Charles J. Cunningham, Philadelphia, for appellant, Commonwealth Ass'n of School Adm'rs.

John G. Knorr, Harrisburg, for appellant amicus curiae, Office of Atty. Gen.

Barbara Ann McNeil, Philadelphia, for appellee, Philadelphia School Dist.

Michael Ira Levin, Huntingdon Valley, for appellee, Pennsylvania School Boards Ass'n.

Linda J. Shorey, John P. Krill, Harrisburg, for Robert C. Jubelirer and Matthew J. Ryan.

Before: FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

Chief Justice ZAPPALA.

This is a direct appeal from an order of the Philadelphia County Common Pleas Court declaring Section 4 of Act 105–1996, 71 P.S. § 371 (Act 105), unconstitutional.[1] Act 105 confers on certain school administrators the right to bargain

1. For purposes of clarity, it should be noted that Act 105 of 1996 encompasses legislation in addition to that at issue here. The School District's challenge focuses on Section 4 of Act 105, codified at 71 P.S. § 371, the collective bargaining provision for school administrators. However, by ruling that the *enactment* of Act 105 did not comply with the constitutional procedural requirement set forth in Article III, Section 4 of the Pennsylvania Constitution, the common pleas court effectively declared Act 105 unconstitutional in its entirety.

collectively concerning terms and conditions of employment, as well as binding arbitration for resolution of impasses in the collective bargaining process. For the reasons that follow, we reverse the order of the common pleas court, finding no constitutional impediments in the law.

The Philadelphia School District and its superintendent, David Hornbeck, joined by the Pennsylvania School Boards Association (collectively referred to as "School District"), initiated this challenge to Act 105 in the Commonwealth Court. That court determined that neither the Commonwealth, the Secretary of Education, nor the Governor, who were originally named as defendants, was an indispensable party, and thus the court did not have original jurisdiction over four of the five counts presented.[2] Accordingly, the matter was transferred to the common pleas court, where it proceeded solely against the Commonwealth Association of School Administrators, Teamsters Local 502 (Association).

The common pleas court granted the declaratory relief requested by the School District, ruling that Act 105 violated three separate state constitutional provisions. First, it determined that Act 105 violated the non-delegation provision of Article III, Section 31 of the Pennsylvania Constitution because it improperly delegated legislative power to a board of arbitration. The court based this conclusion on several factors. It held that Act 105 provided for both mandatory and binding arbitration without limitation, as opposed to binding arbitration undertaken pursuant to an agreement between the parties. The court ruled that the power delegated by Act 105 is legislative in character, not only because it may require legislation or taxes to effectuate the arbitrator's decision, but also because it infringes upon the ability of local and state legislative bodies to make decisions regarding the organization of the school district and the implementation of its policies.[3]

---

2. The court determined that the Governor was an indispensable party as to one count of the complaint, but it granted the Governor's preliminary objections to that count, holding that the claim was non-justiciable.

3. It relied on the fact that the Association purportedly utilized arbitration in its efforts to undermine proposals to restructure the school

It further held that the legal characterization of the entity affected by the arbitration, i.e., the School District, constituted a municipal entity, to which the constitutional prohibition was intended to apply. The court found that there is no provision in Act 105 that distinguishes arbitration decisions requiring legislative acts from other types of decisions.

The court also held that Act 105 violated Article III, Section 4 of the Pennsylvania Constitution because the Legislature materially altered or amended the original version of the bill before enactment without consideration on three separate dates. Finally, the court ruled that Act 105 violated Article III, Section 14 of the Pennsylvania Constitution by impeding Philadelphia County's ability to maintain a "thorough and efficient" system of education. It based this conclusion on the Act's broad mandate that enabled the Association to submit to collective bargaining and binding arbitration various policy disputes of a supervisory nature that extended beyond the issues of wages and benefits.

The Association filed a notice of appeal, vesting jurisdiction in this Court pursuant to 42 Pa.C.S. § 722(7). Thereafter, we granted a petition to intervene filed by the Speaker of the Pennsylvania House of Representatives and the President Pro Tempore of the Pennsylvania Senate.

 We must now determine whether Act 105 passes constitutional muster. As with all questions of law our review is plenary. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167 (1995). It is well established that a statute is presumed to be constitutional and will not be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution. *Commonwealth v. Cotto*, 562 Pa. 32, 753 A.2d

district and form peer advisory teams to implement remediation plans directed at schools that are below standard. It further referenced the Association's opposition to the formation of a board comprised in part of principals to study the merits of replacing intermediary schools with schools covering kindergarten through eighth grades. The Association's opposition was purportedly based on the fear of the elimination of managerial level positions and resulted in the filing of a grievance and a demand for arbitration.

217, 219 (2000). Therefore, the party challenging the constitutionality of a statute has a heavy burden of persuasion. *Id.*

Our analysis begins with an examination of the challenged portions of Act 105, codified at 71 P.S. § 371. Subsection (a) of Section 371 grants school administrators employed by a city of the first class "the right to bargain collectively with their public employers regarding the terms and conditions of their employment, including compensation, hours, working conditions and other benefits." 71 P.S. § 371(a). It further grants school administrators "the right to an adjustment or settlement of their grievances or disputes in accordance with the terms of [Section 371]." [4],[5]

Subsection (h) of Section 371 provides that the determination of the board of arbitration shall be final on the issue in dispute and binding upon the public employer and school administrators involved, without appeal to any court. It further states that:

> The determination shall constitute a mandate to the superintendent of schools in cities of the first class, with respect to matters which can be remedied by administrative action, to take the action necessary to carry out the determination of the board of arbitration.

71 P.S. § 371(h).[6] Subsection (*l*) defines "school administrator" as "all supervisory and administrative employes of a school district below the rank of superintendent, district superintendent, executive director, associate superintendent, assistant superintendent or assistant executive director, but

4. The 1997 amendment to subsection (a) deleted references to retirement and pension benefits.

5. Subsections (b)–(g), *inter alia*, set forth the duty to collectively bargain in good faith; establish the duration of collective bargaining; define when an impasse has occurred; describe the selection of arbitrators and the schedule for arbitration; require notice to the Secretary of Education; and recognize an arbitrator's power to administer oaths and compel the attendance of witnesses and physical evidence by subpoena.

6. Subsections (i)–(k), *inter alia*, describe how the arbitrators are to be compensated; reference the Public Employe Anti–Strike Law; and note that the section applies to cities of the first class, whether or not they have adopted a home rule charter.

including those persons having the rank of first level supervisor." *Id.* at § 371(*l*).

■ Our first issue for review is whether this legislative pronouncement violates Article III, Section 31, of the Pennsylvania Constitution, which prohibits the delegation of certain legislative powers. This section provides, in pertinent part, as follows:

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.[7]

Pa. Const. art. 3, § 31.

In drafting the former non-delegation provision, Article III, Section 20,[8] the framers of the Constitution intended to prevent independent commissions from exercising municipal powers that may result in the expenditure of tax dollars. In *Tranter v. Allegheny County Authority, et al.*, 316 Pa. 65, 173 A. 289 (1934), our Court recognized that:

> By 1873, when the convention was engaging in preparing the constitution, public opinion had recognized the economic mistake of taking from municipalities certain powers and conferring them on independent commissions, while, at the same time, requiring the municipality to pay the bills incurred by the commission without any restraining voice in the expenditure. The separation of power to incur debts from the duty of providing for their payment by taxation,

7. Section 31 also provides an exception to that general rule, which allows the enactment of laws establishing panels or commissions for the settlement of grievances and collective bargaining by binding arbitration between police and firemen with respect to matters that can be remedied by administrative action as well as those requiring legislative action.

8. At the 1967 Constitutional Convention, the framers of the current Pennsylvania Constitution adopted Article III, Section 20, renumbering it as Article III, Section 31.

produced the principal mischief complained of and which it was sought to prevent.

*Id.* at 295.

The statute challenged in *Tranter* created the Allegheny County Authority, a public corporation empowered, *inter alia*, to construct, maintain and operate bridges, streets and highways. The statute did not afford the Authority the power to pledge the credit of the Commonwealth or any local governmental entity. The Court upheld the statute, finding no violation of the non-delegation clause. It based its decision on the fact that the Authority did not constitute a special commission or a private corporation or association. It further concluded that the statute authorized no supervision or interference with municipal improvements, money, property or effects in the sense contemplated by the constitution. *Id.* at 295. Thus, the power granted the Authority was delegable.

In *Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90 (1937), the issue was whether a statute that granted the Philadelphia School District the power to levy taxes constituted an improper delegation of legislative power. We held that there is an unconstitutional delegation of taxing power where the legislature confers unrestrained authority upon an appointed school board to fix the salaries for teachers. In reaching this conclusion, we recognized that the Philadelphia School District constituted a school district of the first class and had been governed by appointive officers rather than elected ones since its creation. The Court emphasized the difference between an elected school board, which is accountable for its actions at the polls, and an appointed school board, which is not. The Court concluded that the "effect of the delegation by the General Assembly is to vest in the school board the unlimited power of increasing expenses, plus the right to levy a tax in an amount sufficient to cover the expenditures to be incurred. The Constitution prohibits this, and this court must give effect to the mandate of its framers." *Id.* at 99.

The next relevant case in the analysis is *Erie Firefighters Local No. 293 v. Gardner*, 26 Pa. D. & C.2d 327, *aff'd per curiam*, 406 Pa. 395, 178 A.2d 691 (1962), the case upon which the trial court relied in finding Act 105 unconstitutional. There, a dispute arose between the City of Erie and its firemen regarding the adoption of a pension plan to be financed by equal contributions by the firemen and the City, amounting to one percent of the firemen's pay. Pursuant to the Act of 1947,[9] which established a grievance procedure for public employees who had no right to strike, a three-member panel recommended that the City adopt the necessary ordinances to establish the pension plan. The City refused. Thereafter, the union representing the firemen commenced a mandamus action to compel the City of Erie to enact the ordinances to create the pension plan.

The issue for review was whether the court could compel the City to pass ordinances consistent with the findings of a negotiation panel. The court emphasized that the panel's recommendation could not have been carried out by administrative decree. *Id.*, 26 Pa. D. & C.2d at 331. Legislation would have been required to adopt the pension plan suggested by the panel because the City Code required that compensation of city officers be set by ordinance, 53 P.S. § 35902. Upon reviewing the language of the Act of 1947, the court concluded that it did not require the City of Erie to enact the legislation prayed for. It based its decision on the fact that the statute did not expressly state that the panel's findings were to be considered binding on the lawmakers.

9. The Act of June 30, 1947, P.L. 1183, as amended, 43 P.S. § 215.1, provided that controversies between the firemen and the city would be resolved by an appointed three-member panel who shall hold hearings to determine the merits of any grievance filed. The act then provided that the panel shall file its findings with the governor, the general assembly, and the head of the agency or political subdivision involved, who shall take the proper administrative measures to comply with the findings of the panel. The act then provided that if the person receiving the report finds that the situation can be remedied only by legislative action, the said person shall refer the matter to the proper lawmaking body "for correction."

The court ruled, however, that assuming that the statute *did* require the City to adopt the panel's findings, the statute violated the predecessor non-delegation clause. The court went on to state:

> [T]he basic distinction between delegable and nondelegable functions, apart from the proscription against levying taxes, seems to be this: If the delegation of power is to make the law, which involves a discretion of what the law shall be, then the power is nondelegable. If the conferred authority is the power or discretion to execute the law already determined and circumscribed, then the delegation is unobjectionable. If we are correct in this interpretation of the rule, then there is no question but that the power to fix municipal salaries and to create a pension plan is nondelegable under our Constitution, for these matters, as have been mentioned above, are pure municipal functions. We are of opinion, therefore, that if the Act of 1947 makes the findings of the panel of conciliators binding upon the city in so far as the creation of municipal ordinances is concerned, then that portion of the act which so states is unconstitutional and cannot be enforced in this proceeding.

*Id.* at 334–335.

Applying this law to the instant case, we find no improper delegation of legislative power. Simply put, the power the legislature delegated in Act 105 is *administrative power* possessed by the *School District,* as opposed to *legislative power* reserved by the *General Assembly.* The nature of the power delegated as well as the legal characterization of the entity affected by the arbitration, i.e., the School District, distinguishes this case from *Erie Firefighters.* In *Erie Firefighters,* the action requested could only have been executed by the enactment of an ordinance, a function clearly reserved for the legislature. The Association persuasively argues that, to the contrary, Act 105 specifically states that the arbitrator's determination is "a mandate to the superintendent of schools ... **with respect to matters which can be remedied by administrative action,** to take action necessary to carry out the determination of the Board of Arbitrators." 71 P.S. § 371(h)

(emphasis added). Thus, the lower court erroneously concluded that there was no provision in Act 105 that distinguishes arbitration decisions requiring legislative action from other types of decisions.[10] As Act 105 can be interpreted in a manner that delegates purely administrative decision-making, it does not clearly, palpably and plainly violate the Article III, Section 31 prohibition against the delegation of *legislative* power, and shall be upheld in this regard.

Moreover, we recognized in *Wilson* that the purpose of the non-delegation clause is to protect against the exercise of the taxing power by officials not subject to the control of the people. Considering that the arbitration is binding upon the Philadelphia School District, which has no independent taxing power, the terms of Act 105 of are not inconsistent with this purpose.[11]

10. The trial court quoted this provision, noting "although the meaning of this qualification is not altogether clear, nowhere in this litigation is it disputed that the power of arbitrators to formulate binding decisions under Act 105 is plenary." Trial court opinion at 19. We disagree. As argued by the Association, the plain statutory language, when read in its entirety, qualifies the power granted to the arbitrators. The trial court further noted that "[b]y excepting decisions that are 'legislative' in character from binding arbitration, the constitutional pitfalls *could have* been eliminated." Trial court opinion at 22 (emphasis added). To the contrary, we find that the Legislature has done just that.

11. In their supplemental briefs filed upon the direction of this Court, the Legislative Intervenors question whether Article III, Section 31 even applies to the Philadelphia School District because, as noted, a school district of the first class possesses no independent taxing power. The Legislative Intervenors conclude that the Philadelphia School District does not perform "municipal functions" as set forth in Article III, Section 31. Based on case law unrelated to the particular constitutional provision at issue, the Legislative Intervenors further assert that school districts in general do not perform municipal functions and therefore are not protected by the Article III, Section 31 prohibition against nondelegation.

We agree that the School District's lack of independent taxing authority distinguishes this case from *Erie Firefighters* because Act 105 is not binding on a City Council and cannot compel the adoption of an ordinance or the levy of a tax. However, we save for another day the issue of whether school districts of the first class, specifically, or school districts in general, may be afforded protection under Article III, Section 31 in the appropriate case.

Moreover, while we have rejected the School District's argument, and the common pleas court's conclusion, that Act 105 is facially invalid as

Having determined that Act 105 does not violate Article III, Section 31, our next inquiry is whether Act 105 offends Article III, Section 4 of the Pennsylvania Constitution, which provides as follows:

Every bill shall be considered on three different days in each House. All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least twenty-five per cent of the members elected to that House, any bill shall be read at length in that House. No bill shall become a law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

Pa. Const. art. III, § 4.

The Legislative Intervenors contend that this issue is non-justiciable under the political question doctrine, the speech or debate clause and the enrolled bill doctrine. As a preliminary matter, the Legislative Intervenors argue that, because they were not involved in this matter before the trial court, there is no evidence in the record as to the legislative process employed to enact Act 105. Thus, they contend that there is no enactment process before us to review.[12] The Legislative Intervenors further maintain that the trial court can not take judicial notice of the legislative journals because such practice is prohibited by our decision in *Mikell v. Philadelphia School District*, 359 Pa. 113, 58 A.2d 339 (1948).

These arguments fail to recognize that the trial court in the instant case did *not* take judicial notice of portions of the legislative journals relating to Act 105. Rather, the court

an impermissible delegation of legislative power, this holding does not in and of itself insulate every attempted application of the enactment from judicial review concerning whether it resides within the boundaries of the authority conferred by the General Assembly.

12. The Legislative Intervenors do not allege that the legislative history set forth by the trial court was erroneous in any way.

noted that "[t]he legislative history leading to the passage of Act 105 is not in dispute." Trial court opinion at 26. The parties do not argue to the contrary in their appellate briefs filed in this Court. Moreover, even assuming that the Association and the School District, as private parties, did not or could not have stipulated to Act 105's legislative history, courts have routinely taken judicial notice of legislative journals as well as various versions of bills ultimately enacted into law. *See Common Cause/Pennsylvania v. Commonwealth,* 710 A.2d 108, 112 (Pa.Cmwlth.1998) (holding that although parties have not stipulated to the facts relating to the enactment of a statute, the court can take judicial notice of legislative journals and various versions of the bill ultimately enacted), *aff'd per curiam,* 562 Pa. 632, 757 A.2d 367 (2000); *League of Women Voters of Pennsylvania v. Commonwealth,* 692 A.2d 263, 263 (Pa.Cmwlth.1997); *Pennsylvania AFL–CIO v. Commonwealth,* 691 A.2d 1023 (Pa.Cmwlth.1997), aff'd, 563 Pa. 108, 757 A.2d 917 (2000); *Pennsylvania AFL–CIO v. Commonwealth,* 683 A.2d 691, 692 (Pa.Cmwlth.1996).[13]

Having rejected the Legislative Intervenor's contention that the record lacks evidence of the process leading to the enact-

---

13. The Commonwealth Court's decisions in these cases do not appear to conflict with *Mikell.* There, a taxpayer challenged a statute that imposed a personal property tax upon the residents of a first class school district. The taxpayer alleged, *inter alia,* that the revenue-raising measure originated in the Senate as opposed to the House of Representatives and therefore violated Article III, Section 14 of the Pennsylvania Constitution. This Court held that the statute was not a revenue-raising measure and therefore did not violate the constitution. The Court went on to address the taxpayer's claim that one need not go behind the statute to determine its origin because the Report of the Committee of Conference on the bill was placed in the record by stipulation of counsel. Applying a strict application of the enrolled bill doctrine, we stated, "in order to show that Act No. 319 was introduced in the General Assembly as a Senate bill, evidence *aliunde* is necessary for which purpose legislative journals, records and reports are not competent." 58 A.2d at 345. The Legislative Intervenors premise their entire argument on this statement.

Such reliance is misplaced. In the fifty plus years since *Mikell* was decided, the case has never been cited for the proposition that the Legislative Intervenor's propose. Moreover, the quoted statement was grounded in a strict application of the enrolled bill doctrine, which, as discussed *infra,* our Court subsequently modified. See *Consumer Party v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986).

ment of Act 105, we now proceed to consider whether the School District's claim under Article III, Section 4 is justiciable. The first doctrine invoked by the Legislative Intervenors is the political question doctrine.

■ The political question doctrine is generally considered to derive from the principle of separation of powers. A basic precept of our form of government is that the executive, the legislature and the judiciary are independent, co-equal branches of government. *Sweeny v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977). Although the ordinary exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers, there are certain powers constitutionally conferred upon the legislative branch that are not subject to judicial review. *Id.* A challenge to the Legislature's exercise of a power which the Constitution commits exclusively to the Legislature presents a non-justiciable political question. *Id.*

In the seminal case of *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the United States Supreme Court discussed the standards for determining whether a political question exists:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.

■ We hold that the political question doctrine does not prevent us from reviewing the School District's challenge to Act 105 as violative of Article III, Section 4. The School

District is not attempting to challenge the exercise of a power that the Constitution commits exclusively to the Legislature. To the contrary, the School District is alleging that the Legislature violated the mandatory provisions of Article III, Section 4 of the Pennsylvania Constitution by failing to consider the bill on three separate days in each House. This Court need not make a legislative policy determination in order to resolve this claim nor do we lack judicially manageable standards for evaluating the issue.

■ Similarly, we reject the Legislative Intervenor's contention that the Speech or Debate Clause renders the School District's challenge to Act 105 non-justiciable. The Speech or Debate Clause, set forth in Article II, Section 15 of the Pennsylvania Constitution provides:

The members of the General Assembly shall in all cases, except treason, felony, violation of their oath of office, and breach or surety of the peace, be privileged from arrest during their attendance at the sessions of their respective Houses and in going to and returning from the same; and for any speech or debate in either House they shall not be questioned in any other place.

Pa. Const. art. II, § 15.

■ This Court has observed that the text of the Speech and Debate Clause of the Pennsylvania Constitution is essentially the same as its counterpart in the United States Constitution, Article I, Section 6. *Consumers Education and Protective Association v. Nolan*, 470 Pa. 372, 368 A.2d 675, 680 (1977). The legislative immunity created by the Speech and Debate Clause "insures that legislators are free to represent the interests of their constituents without fear that they will be later called to task in the courts for that representation." *Powell v. McCormack*, 395 U.S. 486, 503, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The Speech and Debate Clause prohibits inquiry into those things generally said or done in the House or Senate in the performance of official duties and into the motivation for those acts. *Id.* at 502–03, 89 S.Ct. 1944

The School District's challenge to Act 105 as violative of Article III, Section 4, does not seek to hold particular legisla-

tors legally responsible; nor does it seek privileged information regarding the legislative process. As discussed *supra* at 485–86, the judicial practice of examining the legislative journals to discover the legislative history of a particular statute has been upheld. Thus, there is no reason for judicial abstention as to the merits of this claim.

The final doctrine of judicial restraint that the Legislative Intervenor's seek to employ is the enrolled bill doctrine.[14] Historically, our Court has refrained from inquiring into alleged procedural irregularities in the passage of legislation and has presumed that a statute has been legally enacted. *Kilgore v. Magee*, 85 Pa. 401 (1877). Well over a century ago, our Court recognized that:

In regard to the passage of the law and the alleged disregard of the forms of legislation required by the constitution, we think the subject is not within the pale of judicial inquiry. So far as the duty and consciences of the members of the legislature are involved the law is mandatory. They are bound by their oaths to obey the constitutional mode of proceeding, and any intentional disregard is a breach of duty and a violation of their oaths. But when a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage. The presumption applies to the act of passing the law, that applies generally to the proceedings of anybody whose sole duty is to deal with the subject. The presumption in favor of regularity is essential to the peace and order of the state.

*Id.* at 412.

Although not framed as such, this embodiment of the "enrolled bill doctrine" remained the law of this Commonwealth

14. An enrolled bill is a bill that has been certified by the Speaker of the House and the presiding officer of the Senate as having passed the General Assembly, which has been signed by the Governor, and which has been filed with the Secretary of the Commonwealth. *See Pennsylvania AFL–CIO v. Commonwealth*, 691 A.2d 1023, 1031 n. 12 (Pa. Cmwlth.1997), *aff'd*, 563 Pa. 108, 757 A.2d 917 (2000).

until our Court rendered the seminal decision in *Consumer Party v. Commonwealth. of Pennsylvania,* 510 Pa. 158, 507 A.2d 323 (1986), which modified this traditional approach.

In *Consumer Party,* a political party and several taxpayers challenged the constitutionality of the Public Official Compensation Law of 1983, 65 Pa.C.S. § 366.1 *et seq.,* on the ground that it violated several provisions of the Pennsylvania Constitution, including Article III, Section I.[15],[16] This claim was based upon the allegation that there was a change in the original purpose of the bill between its initial passage in the House and Senate and the version submitted by the Committee for reconsideration by both the House and Senate. The parties agreed to have the case resolved upon stipulated facts and cross-motions for summary judgment. The Commonwealth Court granted summary judgment in favor of the Commonwealth.

On appeal to our Court, the Commonwealth, as appellee, argued that the issue regarding Article III, Section I, was not justiciable. Our Court disagreed. We recognized that we have found challenges to procedural irregularities in the enactment of legislation non-justiciable by employing the enrolled bill doctrine or determining that a particular constitutional provision is directory and not mandatory. *Id.* at 332. However, we concluded, "whatever theory is employed, the legitimacy of the abstention is dependent upon the situation presented." *Id.* at 333. We went on to state that "[w]hile it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation." *Id.*

**15.** Section I of Article III provides as follows:

No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

Pa. Const. art. III, § 1.

**16.** Unlike the instant case, *Consumer Party* did not involve a challenge to the statute based on Article III, Section 4. *See* 507 A.2d at 334 n. 15.

We emphasized that our Court need not inquire into every allegation of procedural impropriety in the passage of legislation, but "where the facts are agreed upon and the question presented is whether or not a violation of a mandatory constitutional provision has occurred, it is not only appropriate to provide judicial intervention, and if warranted a judicial remedy, we are mandated to do no less." *Id.* at 334. We noted that in making the judgment as to the propriety of abstention we must distinguish between challenges to the legislative wisdom and challenges asserting an abuse of power—the former being non-justiciable and the later reviewable.

This new standard was applied in *Parker v. Commonwealth of Pennsylvania, Department of Labor and Industry,* 115 Pa.Cmwlth. 93, 540 A.2d 313 (1988), *aff'd per curiam,* 521 Pa. 531, 557 A.2d 1061 (1989), where the statute challenged was Section 402.5 of the Unemployment Compensation Law, 43 P.S. § 802.5, as it applied to seasonal workers. As in the instant case, the constitutional challenge was based on Article III, Section 4. Relying on *Consumer Party,* the court rejected the allegation that such a claim was non-justiciable and examined the merits of the claim that the particular legislation was not considered on three different days in each House.

The substantive issue arose as to whether a bill that has been amended in one House must, after having been sent back to the House in which it originated, be approved by that House in compliance with Article III. The court answered this inquiry in the negative and adopted the rule followed by other jurisdictions, which provided that "an amended bill need not be referred to committee or considered on three separate days in the House from which the bill which was amended originated, *if the amendments are germane to, and do not wholly change, the general subject of the bill.*" 540 A.2d at 328 (emphasis added).

The court applied this rule and found no violation of Article III, Section 4. It noted that the general subject of the version of the House Bill that was sent to the Senate for approval was agricultural business in the Commonwealth. By amending the bill to provide for what is in effect an unemployment compen-

sation tax advantage to companies engaged in canning and freezing of fruits and vegetables, the court held that the Senate did not change the subject matter of the bill.

It is therefore clear from the holdings in *Consumer Party* and *Parker* that the enrolled bill doctrine does not preclude us from reaching the merits of the School District's challenge to Act 105 as violative of Article III, Section 4.

We now examine the substance of the School District's claim that the amendments to Act 105 were not germane to the general subject of the original bill and were not considered on three separate days by each House as is required by Article III, Section 4.

Act 105 originated as an act transferring the Scotland School for Veteran's Children from the Department of Education to the Department of Military Affairs, and conferring certain powers upon the Trustees of the Scranton State School for the Deaf, the Board of Trustees of Scotland School for Veteran's Children, and the Board of Trustees of Thaddeus Stevens Trade School. The powers conferred included the election of a principal or superintendent and the fixing of salaries of school employees in accordance with established standards. The act further reorganized certain executive positions. In its initial form as provided on October 17, 1995, the title to the legislation read:

Amending the Act of April 9, 1929 (P.L. 177, No. 175), entitled,

"An act providing for and reorganizing the conduct of the executive and administrative work of the Commonwealth by the Executive Department thereof and the administrative departments, boards, commissions, and officers thereof, including the boards of trustees of State Normal Schools, or Teachers Colleges; abolishing, creating, reorganizing or authorizing the reorganization of certain administrative departments, boards and commissions; defining the powers and duties of the Governor and other executive and administrative officers, and of the several administrative departments, board, commissions, and officers; fixing the salaries

of the Governor, Lieutenant Governor, and certain other executive and administrative officers; providing for the appointment of certain administrative officers, and of all deputies and other assistants and employees in certain departments, board and commissions; and prescribing the manner in which the number and compensation of the deputies and all other assistants and employees of certain departments, boards and commission shall be determined," [sic] transferring the Scotland School for Veterans' Children, from the Department of Education to the Department of Military Affairs.

After being referred to several Senate Committees, the bill came before the Senate again on February 6, 1996 and February 12, 1996. At that time, amendments were made affecting the Scotland School for Veterans' Children. Following review in the Senate, the bill was transferred to the House of Representatives where it underwent certain revisions not relevant here. On June 27, 1996, the bill was again amended to cover collective bargaining and binding arbitration of school administrators. The bill was then approved by both the House and Senate one day later and was subsequently signed into law on July 11, 1996.

We find this enactment process to be in compliance with Article III, Section 4. The amendments to Act 105 are germane to and do not wholly change the general subject of the bill, which is to transform various aspects of school administration. In ruling that Act 105 violated Article III Section 4, the trial court focused on the fact that "[t]here was no reference whatsoever in the legislation or title to any subject even remotely related to the arbitration of labor disputes involving school administrators." Trial court opinion at 27. This overly narrow view of the legislation ignores the fact that the initial draft of the bill, as well as the subsequent amendments, related to the administration of schools. As in *Parker*, the fact that the amendments to Act 105 substantively changed the bill is not dispositive; for it is expected that legislation will be transformed during the enactment process. We have recognized that legislation can be "materially

changed" without wholly changing its purpose. See *Consumer Party*, 507 A.2d at 335 (*rejecting* the contention that any material change in a piece of legislation during its passage would cause it to be constitutionally suspect). A contrary holding would be incompatible with the traditional legislative process, which is to obtain a consensus. *Id.*

The School District argues, and the trial court held, that the instant case is controlled by *Pennsylvania Association of Rental Dealers (PARD) v. Commonwealth*, 123 Pa.Cmwlth. 533, 554 A.2d 998 (1989), and *Common Cause/Pennsylvania v. Commonwealth*, 668 A.2d 190 (Pa.Cmwlth.1995), *aff'd per curiam*, 544 Pa. 512, 677 A.2d 1206 (1996).[17] We find both cases distinguishable.

The *PARD* decision involved a challenge to the Installment Sales Act on the ground that its passage violated Sections 1, 2 and 4 of Article III of the Pennsylvania Constitution.[18] The Act at issue originally involved farmers' payments of estimated taxes. An amended bill, which was only considered in the House on one day, deleted all of the language relating to farmers' estimated tax payments and added new language providing for financial assistance to local taxing authorities. The bill was again amended by deleting all language concerning assistance to local taxing authorities. New language was added to provide that certain consumer transactions whereby a customer purchased consumer goods following the expiration of a lease fell within the purview of the Installment Sales Act.

Applying the test set forth in *Parker*, the court held that the payments of estimated taxes by farmers set forth in the original bill was not germane to the amended bill that included certain consumer transactions within the purview of the Installment Sales Act. The court concluded that the amendments

**17.** Although the trial court mistakenly cited the decision in *Parker*, the facts of the case discussed were clearly those of *Pennsylvania Association of Rental Dealers*. Trial court opinion at 25.

**18.** The text of Section 1 of Article III is set forth *infra*, on page 16, note 16. Section 2 of Article III provides:

No bill shall be considered unless referred to a committee, printed for the use of the members and returned therefrom.

Pa. Const. art. III, 2.

finally passed by the House wholly changed the original bill without it being considered three times in each House, thereby violating Article III, Section 4. In reaching this conclusion, the court rejected the Commonwealth's contention that the amendments were germane because both bills affect the economic well being of the Commonwealth. The court stated "[t]o take such a broad view of the germaneness test would, in our view, render that test meaningless." 554 A.2d at 1002. Unlike *PARD*, the amendments to Act 105 are not linked to the original bill merely by a vague assertion that both bills will benefit the Commonwealth's economy. Rather, as noted, the original bill and the amendments both relate to the administration of certain schools.

The decision in *Common Cause* is distinguishable on different grounds, as that case involved an appropriations bill, which has specific constitutional requirements not applicable to substantive legislation as is involved here. The petitioners in *Common Cause* challenged various aspects of an act that began as a bill making appropriations to the Public Utility Commission and was amended to become the 1995–96 General Appropriations Act. Among the constitutional violations alleged was a contention that the enactment process violated Article III, Section 4. Although the court found a violation of Article III, Section 4, such conclusion was dependent on its finding that the enactment process violated Article III, Section 11, which requires that general appropriation bills be confined to one subject.[19] The court therefore concluded that by amending a specific appropriation bill to become a general appropriations bill, the general subject of the bill had been wholly changed without consideration in each House on three separate days in violation of Article III, Section 4. As Act 105

**19.** Article III, Section 11 provides:

The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments for the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

Pa. Const. art. III, § 11.

is not an appropriations bill, the holding in *Common Cause* is of little import here.

■ In its final claim, the School Distinct contends that Act 105 violates Article III, Section 14, of the Pennsylvania Constitution, which mandates that the General Assembly "provide for the maintenance and support of a thorough and efficient system of public education." Pa. Const. art. III, § 14. The Legislative Intervenors contend that this constitutional challenge is non-justiciable under the political question doctrine. We agree, finding our recent decision in *Marrero v. Commonwealth of Pennsylvania*, 559 Pa. 14, 739 A.2d 110 (1999), controlling.

In *Marrero*, the City of Philadelphia filed a declaratory judgment action, contending that the General Assembly violated the Pennsylvania Constitution by failing to provide adequate funding for the Philadelphia School District in violation of Article III, Section 14's mandate to the General Assembly to provide for the "maintenance and support of a thorough and efficient system of public education."

The Commonwealth Court sustained the Commonwealth's preliminary objections on the ground that the claim was non-justiciable. It reasoned that: (1) there was a lack of judicially manageable standards for resolving whether the General Assembly had in fact provided sufficient funding to operate the school system; (2) it would be impossible to resolve the claim without making a legislative policy determination; and (3) resolution of the issue had been solely committed to the discretion of the General Assembly under Article III, Section 14. The court held that the General Assembly satisfied the mandate to provide a thorough and efficient system of public education by enacting a number of statutes relating to the operation and funding of the public school system. *Id.* This Court affirmed, extensively citing the opinion of the Commonwealth Court and concluding that the opinion "disclose[d] no error, but rather a conscientious adherence to precedent." *Id.* at 114.

The identical analysis can be applied in the instant case. Unlike the School District's claim under Article III, Section 4, there is no judicially manageable standard for determining whether the Legislature's enactment of Act 105 resulted in a failure to provide for a "thorough and efficient system of public education." Moreover, in examining the merits of this claim, the trial court clearly delved into the soundness of the policy set forth by the Legislature. Specifically, the trial court held that Act 105 violates Article III, Section 14's mandate for a "thorough and efficient system of public education" by:

(1) Compromising the ability of principals and administrators to partake in initiatives affecting the school district;

(2) Placing principals and administrators in a conflicted position;

(3) Compromising the legislature's control over managerial policy including that related to the structuring of the school district and implementation of remediation plans;

(4) Precluding the legislature and school board from making changes as warranted by the continuing day to day needs of the student body; and,

(5) Bringing policy initiatives to an impasse pending arbitration.

Trial court opinion at 29.

Such policy conclusions are outside the realm of judicial decision-making and cannot be upheld. *See Reichley v. North Penn School District*, 533 Pa. 519, 626 A.2d 123 (1993) (holding that a claim that a statute permitting labor strikes by public educators violated Article III, Section 14, was not an issue for the court to act on because it involved policy considerations reserved for the legislators); *Teachers' Tenure Act Cases*, 329 Pa. 213, 197 A. 344, 352 (1938) (holding that "courts will not inquire into the reason, wisdom or expediency of the legislative policy with regard to education"). Consistent with our holding in *Marrero*, we find that the School District's claim under Article III, Section 14, presents a non-justiciable politi-

cal question. Further review of the merits by this Court is therefore prohibited.[20]

Accordingly, having rejected all claims of constitutionality infirmity, we reverse the order of the trial court.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

20. Our resolution of this issue renders moot the Amicus Attorney General's contention that the School District lacks standing to assert a claim under Article III, Section 14 of the Pennsylvania Constitution because that provision offers no protection to a school district.