## McNaughton v. McNaughton

C.P. of Dauphin County, no. 2003 CV 0661.

*Richard Gaffney Jr.,* for plaintiff.
*Sandra Meilton,* for defendant.
*C. Clark Hodgson Jr.,* for House of Representatives.

TURGEON, *J.,* July 7, 2005—Plaintiff Diane Mc-Naughton (Wife) has filed a subpoena seeking financial documents in connection with her divorce action against her husband, defendant Mark McNaughton

(Husband), a member of the Pennsylvania House of Representatives (House). Before the court is the House's motion to quash that subpoena. Wife seeks documents related to Husband's House expense checking account and his House calendar. The House argues that the items sought are not subject to discovery under the Pennsylvania Constitution's Speech and Debate Clause, which creates a legislative privilege protecting General Assembly members from all inquiries concerning activities that fall within the legislative sphere. I denied the motion to quash, finding that the legislative privilege does not apply. This opinion is written in support of that order.

## BACKGROUND

Wife's divorce action includes counts for equitable distribution of marital property, child and spousal support, alimony and counsel fees. To advance her economic claims, she seeks to determine Husband's "income from any source," as permitted under the law, including Husband's assets and bank accounts. See 23 Pa.C.S. §4322; Pa.R.C.P. 1910.16-2(a). Wife asserts that, although Husband ceased earning a second income from his father's real estate development company in 2003, he has been able to maintain his lifestyle by using his House expense account to pay for various personal expenses. Wife argues that, to the extent he uses these funds for his personal expenditures, they are "income" to him. Wife also seeks information regarding Husband's schedule to determine the extent of his travel and also whether he has engaged in marital misconduct. To that end, Wife served a subpoena upon Husband's chief of staff in his

House office, Kathleen Pacella,[1] seeking the following items:

(a) Copies of any and all calendars and date book for Mark S. McNaughton for the time period of January 1, 2002 through the present date;

(b) Copies of any and all bank statements, cancelled checks, and check registers for the time period of January 1, 2002 through the present date for any and all bank accounts in the name of Mark S. McNaughton on which you are a joint owner; and

(c) Copies of any and all expense account documentation for Mark S. McNaughton for the time period of January 1, 2002 through the present date.

Husband filed a "declaration" with the court stating that he and Ms. Pacella are joint owners of the checking account from which he pays out-of-pocket expenses incurred in the performance of his legislative duties. Declaration of Representative Mark S. McNaughton, ¶4. His duties and expenses include maintenance of his district office, legislative vehicle lease, constituent breakfasts, constituent meetings, other legislator meetings, industry group meetings, out-of-state meetings and informational materials for constituents. *Id.* at ¶5. For convenience, Ms. Pacella is a joint owner of the account, an arrangement used by many legislators to manage their House-related accounts.[2] When Husband incurs an expense related to a

1. Husband indicated in a previous discovery matter that Ms. Pacella is the custodian of his House calendars, date books and expense account documentation, including bank statements, cancelled checks and check registers.

2. At oral argument, the House attorney stated that the leadership instructs House members to create accounts as described by Husband.

legislative function, he normally pays for it by a check drawn on this joint account. Ms. Pacella then applies for reimbursement of that expense from either the House Office of the Chief Clerk or the House Leadership Account. Upon receipt of the reimbursement check, Ms. Pacella deposits the monies into the joint account. *Id.* at ¶6.

Regarding his calendar, Husband states that he has a single date book/calendar maintained by Ms. Pacella. Except for the occasional personal appointment, he states that the entries on the calendar are almost exclusively related to official legislative business, such as committee hearings, meetings with legislators, aides, industry representatives and constituents, and fact-finding or investigative tasks. *Id.* at ¶8.

The House sought to quash the subpoena under Rule of Civil Procedure 4012, in order to protect a third party, Ms. Pacella, from unreasonable annoyance, embarrassment, oppression, burden or expense on the basis that the discovery sought is prohibited by the Pennsylvania Constitution's Speech and Debate Clause.

## LEGAL DISCUSSION

The sole issue is whether our Constitution's Speech and Debate Clause provides an absolute privilege that protects Husband's chief of staff from producing his House checking and expense account documentation, as well as his House date books and calendars.[3] The Speech and Debate Clause provides as follows:

3. There is no right of public access to legislative records under Article I, Section 7 of the Pennsylvania Constitution and no such right

"The members of the General Assembly shall in all cases, except treason, felony, violation of their oath of office, and breach or surety of the peace, be privileged from arrest during their attendance at the sessions of their respective Houses and in going to and returning from the same; and for any speech or debate in either House they shall not be questioned in any other place." Pennsylvania Constitution, Article II, Section 15.

"The Speech and Debate Clause prohibits inquiry into those things generally said or done in the House or Senate in the performance of official duties and into the motivation for those acts." *Pennsylvania School Boards Association v. Commonwealth Association of School Administrators,* 569 Pa. 436, 805 A.2d 476, 486 (2002) (citing *Powell v. McCormack,* 395 U.S. 486, 502-503, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). "The very core of the Speech and Debate Clause is protection of 'the integrity of the legislative process by insuring the independence of individual legislators.' " *Pennsylvania AFL-CIO by George v. Commonwealth,* 691 A.2d 1023, 1034 (Pa. Commw. 1997), *aff'd,* 563 Pa. 108, 757 A.2d 917 (2000) (quoting *United States v. Brewster,* 408 U.S. 501, 507 (1972)). The constitutional immunity provided under this clause "insures that legislators are free to represent the interests of their constituents without fear that they will be later called to task in the courts for that representation." *Pennsylvania School Boards Association,* 805 A.2d at 485 (quoting *Powell* at 503).

---

otherwise exists under either common law or the Pennsylvania Right to Know Act. *Uniontown Newspapers Inc. v. Roberts,* 576 Pa. 231, 839 A.2d 185 (2003).

The Pennsylvania Speech and Debate Clause is essentially identical to and derived from the federal Speech or Debate Clause (U.S. Constitution Article I, Section 6). *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 368 A.2d 675, 680 (1977). The federal clause has been interpreted broadly "to protect legislators from judicial interference with their legitimate legislative activities, and that even where the activity questioned is not literally speech or debate, a court must determine if it falls within the 'legitimate legislative sphere'; if it does, the action against the legislator calling it into question, whether criminal or civil, must be dismissed." *Id.* at 382, 368 A.2d at 680-81. (citations omitted) Our Supreme Court has found "no basis for distinguishing the scope of the Pennsylvania Speech and Debate Clause applicable to members of the General Assembly from that of the federal clause applicable to members of Congress . . . ." *Id.* at 383, 368 A.2d at 681. Furthermore, we note that the Speech and Debate Clause extends beyond providing legislative immunity from suit or shielding oral testimony; it also protects documents from discovery, if the documents contain information that is the product or result of activity within the legitimate legislative sphere. See *Hamilton v. Hennessey,* 783 A.2d 852 (Pa. Commw. 2001) (en banc), *aff'd,* 569 Pa. 101, 800 A.2d 927 (2003) (per curiam); *Brown & Williamson Tobacco Corp. v. Williams,* 62 F.3d 408, 418, 421 (D.C. Cir. 1995).

The U.S. Supreme Court has defined the sphere of legitimate legislative activities to include "activities that are 'an integral part of the deliberative and communicative processes by which members participate in commit-

tee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'" *Youngblood v. DeWeese,* 352 F.3d 836, 840 (3d Cir. 2003) (quoting *Gravel v. United States,* 408 U.S. 606, 625 (1972)). The federal courts have thus defined the legitimate legislative sphere to include such acts as voting for a resolution, subpoenaing and seizing property and records for a committee hearing, preparing investigative reports, addressing a congressional committee and speaking before the legislative body in session. *Id.* The protection of the Speech or Debate Clause has been described as cordoning off from judicial inquiry only a portion—albeit the core—of a Representative's or Senator's work life. *United States v. Eilberg,* 507 F. Supp. 267, 286 (E.D. Pa. 1980).

The U.S. Supreme Court has denied extension of the Speech or Debate Clause, however, to everything "related to the due functioning of the legislative process." *Id.* (quoting *Brewster* at 513). Thus, the *Youngblood* court clarified that "immunity does not extend to acts that are 'casually or incidentally related to legislative affairs but not a part of the legislative process itself'" including performance of legitimate errands for constituents, making appointments with government agencies, assistance in securing government contracts, preparation of newsletters and news releases, and delivering speeches outside the Congress. *Id.* (quoting *Brewster* at 512, 528).

Wife directs this court to the Commonwealth Court's en banc decision in *Hamilton v. Hennessey, supra.* In that case, the plaintiffs, political opponents of a state rep-

resentative, filed suit seeking, among other things, an audit of a state representative's campaign expenses. The plaintiffs alleged that the representative had sent out publicly funded newsletters that were really political advertisements which should have been listed as campaign expenses under state election law. The plaintiffs issued subpoenas seeking financial records related to the newsletters, as well as a request for information about how the House Caucus decided the number of mailings per candidate. The House Republican Caucus, as intervenor, sought to quash the subpoenas arguing, among other things, that the information was protected under the Speech and Debate Clause. The case was assigned to the Honorable Judge Warren G. Morgan, senior judge, who held that the preparation of the newsletter "although 'related' to official business, was not a protected activity," within the legitimate legislative sphere. *Id.* at 860. The Commonwealth Court, on en banc reconsideration, affirmed Judge Morgan's opinion and adopted it as its own.

In addressing Speech and Debate Clause immunity, Judge Morgan analyzed the issue as follows: "[t]he Caucus argues that the subpoenas must be quashed based on Article II, Section 15 of the Pennsylvania Constitution, commonly known as the Speech and Debate Clause, which protects members of the General Assembly and their aides from all inquiry concerning activities that fall within the legislative sphere. The Caucus posits that, since petitioners seek information about decisions concerning expenditures made on behalf of House members, the information sought is within the 'legislative sphere' and thus protected by the Speech and Debate Clause.

"The Caucus points out that, when interpreting the Speech or Debate Clause of the Pennsylvania Constitution, it is appropriate to look to decisions interpreting the federal Speech and Debate Clause, Article I, Section 6 of the U.S. Constitution, citing *Consumers Education & Protective Association v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977). In reviewing such decisions, however, we are compelled to conclude that the immunity afforded by the Speech and Debate Clause is unavailing here.

"In *Schiaffo* [*v. Helstoski,* 492 F.2d 413 (3d Cir. 1974)], the incumbent congressman attempted to raise the Speech and Debate Clause as preventing inquiry into the alleged abuses of the frank. The Third Circuit noted that the U.S. Supreme Court in *United States v. Brewster* . . . had distinguished between activities protected by the Clause and activities that, although 'related' to official duties, were unprotected.[5] 492 F.2d at 418. Among the 'related' but unprotected activities was the preparation of a newsletter. *Id.* Consequently, the Third Circuit concluded that:

"[T]he thrust of *Brewster* requires us to regard [the] use of the frank to mail materials in this case as outside the protection of the Speech and Debate Clause. Mailings of items such as newsletters may well be necessary if a congressman is conscientiously to perform his legislative tasks. But *Brewster* makes it clear that the immunity of the Speech and Debate Clause does not extend to a number of legitimate legislative activities, and we would include among such activities the mailing of materials under the frank.

---

"5. Chief Justice Burger, writing for a four-member majority of the Supreme Court, stated that:

"It is well known, of course, that members of the Congress engage in many activities other than the purely legislative activities protected by the Speech and Debate Clause. These include a wide range of legitimate 'errands' performed for constituents, the making of appointments with government agencies, assistance in securing government contracts, preparing so-called 'newsletters' to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the court in prior cases. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech and Debate Clause. [*Brewster* at 512.]

"Similarly, the Seventh Circuit's decision in *Hoellen* [*v. Annunzio,* 468 F.2d 522 (7th Cir. 1972)] rejected Speech and Debate Clause immunity in a franking case, citing the opinion in the District Court, which held that:

"The *Brewster* decision is decisive of this issue. In holding that the Speech and Debate Clause did not immunize Senator Brewster from prosecution on federal bribery charges, the Supreme Court distinguished between Congressional conduct which is clearly part of the legislative process—such as voting, speaking on the floor or conducting a legislative hearing—and conduct which is incidentally related to the legislative process. The court confined the protections of the Clause to the former and

specifically included the conduct with which we are concerned in the latter . . . .

"In light of this language, there can be no doubt that the activities at issue in this case, sending out documents and questionnaires to constituents and others, while 'entirely legitimate activities' related to the legislative process, are not 'purely legislative activities' protected by the Speech and Debate Clause. Therefore no doctrine of legislative immunity precludes judicial inquiry into the legality of Congressman Annunzio's use of the frank in this case, even if that inquiry necessitates a consideration of his motives in making the mailings.

"468 F.2d at 527 (quoting *Hoellen v. Annunzio,* 348 F. Supp. 305, 314 (N.D. Ill. 1972))." *Id.* at 860-61.

With these principles in mind, we turn our attention to whether the privilege applies to protect from discovery, and production, the items sought in Wife's subpoena. Chief Justice Burger's list in *Brewster* of "entirely legitimate activities" that are "political in nature rather than legislative," not afforded protection by the Speech or Debate Clause, include a wide range of legitimate errands performed for constituents, including the making of appointments with government agencies. *Id.* at n.5 (citing *Brewster* at 512). Therefore, Husband's calendars and date books, at least insofar as they reflect appointments political in nature, fall directly under the category of items not protected under the Speech and Debate Clause.[4] To the extent they contain personal appoint-

---

4. While not bound by cases interpreting the federal clause, those cases nevertheless provide guidance to Pennsylvania courts. *Sweeney v. Tucker,* 473 Pa. 493, 504 n.14, 375 A.2d 698, 703 n.14 (1977); see

ments; they are, of course, unprotected. Insofar as these items might reflect appointments related to the legislative process (such as committee meetings, meetings with legislators and aides, and investigative tasks), they are merely administrative records incidentally related to legislative affairs. They are not in and of themselves part of the legislative process since they reflect only the existence of such legislative meetings and tasks. See *Youngblood* at 840.

Regarding the other items subpoenaed—bank statements, cancelled checks, check registers and expense account documentation—while they may be entirely reflective of legitimate activities related to the legislative process, they are only "casually or incidentally" related thereto and not a part of the legislative process itself. Thus, they are not protected by the Speech and Debate Clause. See *Hamilton* at 861 (citing *Hoellen v. Annunzio*). These documents are merely administrative in nature, not reflective of duties central to the core of a husband's work life as a House member. See *Eilberg, supra*. As noted above, the sphere of shielded legislative activities include those that are "an integral part of the deliberative and communicative processes by which members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters that the Constitution places within the jurisdiction of either House." *Youngblood* at 840. Traditionally integral parts of the legislative process include such things as voting,

---

also, *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 171-74, 507 A.2d 323, 329-31 (1986).

speaking before the legislative body, conducting hearings, subpoenaing and seizing property and records for a committee hearing, preparing investigative reports and addressing committees. *Id.; Hamilton* at 861 (citing *Hoellen v. Annunzio*). The keeping of House account records for the purpose of paying/obtaining reimbursement for expenses related to the functioning of a legislative office is not an integral part of either a deliberative or communicative process required for Husband to participate in the duties required of him as a House member or other such duties required of him under the Pennsylvania Constitution.

The House argues this court should quash the subpoena under the Third Circuit's decision in *Youngblood, supra.* That court held two Pennsylvania state representatives were protected by legislative immunity from a civil rights action filed against them by another representative who claimed that, in retaliation for dissenting against party leadership, they had denied her an adequate budget allocation for district office staffing and constituent services. The Pennsylvania House of Representatives annually appropriates funds to be used by state representatives for district office staffing and constituent service programs. The political party leadership, however, decides how the appropriation is allocated among individual representatives. Upon review of federal jurisprudence, the *Youngblood* court concluded that the House leadership's exercise of its authority to allocate office staffing appropriation was protected by legislative immunity because "the sphere of legitimate, legislative activity" extends to "committee and House proceedings with respect to . . . matters which the Constitution places within the juris-

diction of either House." *Id.* at 841 (quoting *Gravel v. United States* at 625). The court reasoned that under the Pennsylvania Constitution, the General Assembly is granted authority to appropriate funds to be used by members. By making a lump sum appropriation for all representatives' staffing, the General Assembly delegated to the party leaders in the House its legislative authority to determine individual funding. The court concluded: "In this sense, delegating to the party leadership is no different than delegating to a legislative committee completing the allocation process. The party leaders' exercise of that authority is more than merely 'casually or incidentally related' to the appropriation-legislation; it is its direct consequence. [The House leaders'] . . . 'deliberative and communicative processes' in the course of exercising that legislative authority are, therefore, privileged from judicial scrutiny." *Id.* at 841. (citations omitted) The court explained that were it to permit the House member to challenge House leaders' budgetary discretion, the court would be enabling the judicial branch to scrutinize the manner in which the General Assembly allocates internal funds. This, the court found, "would compromise the independence of the legislative branch, the very principle legislative immunity is intended to protect." *Id.* at 842.

The House argues that *Youngblood* is on point and that the appropriation of House funds for official expenses—as reflected in Husband's legislative account records at issue here—are of the same kind involved here and thus protected by the Speech and Debate Clause. The House asserts that *Youngblood* involved the House's leadership allocation of funds to individual legislators, while this

dispute involves an individual legislator's requests for allocations from the leadership. These are two sides of the same coin, according to the House.

Though this case and *Youngblood* bear some facial similarity, the central judicial inquiries invoked are dissimilar. The plaintiff in *Youngblood* sought judicial inquiry into a legislative decision, derived directly from the state constitution, about how House leadership chose to exercise its authority to allocate office staffing appropriations to members of the General Assembly. The party leaders' exercise of constitutional authority was properly deemed more than merely casually or incidentally related to the appropriation-legislation; it was held to be of direct consequence. Such inquiry was clearly prohibited under the Speech or Debate Clause because the judicial branch was being asked to scrutinize the manner in which the General Assembly allocated internal funds.

We are not here asked to scrutinize whether the House leadership has appropriately allocated funds to Husband or his office. The issue here is not whether Husband has been allocated certain House funding, but how he has spent those funds and if for his personal expenses. The legislative decision on allocation of funds to Husband in this case has already been made and Wife is not in any way asking this court to subject that decision for review. Thus, she does not seek judicial inquiry into the purely legislative decision involved in *Youngblood, i.e.,* how to allocate funds under constitutional authority. As such, the Speech and Debate Clause does not protect from discovery the items sought by Wife.[5]

---

5. Husband and/or the House may, of course, file a motion seeking to seal any documents delivered to Wife under her subpoena.

Finally, I note that, upon reviewing the issue of whether to quash the subpoena, this court discovered the existence of a House Rule that permits limited public review of the individual spending made by House members. House Resolution 1 (2005-06 session).[6] House Rule 14 provides reimbursement for certain expenses incurred by House members and their staff for items such as transportation, lodging and food; administrative and clerical services; costs related to running a legislative office; official entertainment; and the purchase of flags, plaques and publications or similar items. *Id.* House Rule 14 requires that disbursements made, debts incurred or advancements paid from any appropriation account made to a House member under a General Appropriation Act or any other appropriation Act must be recorded in a monthly report. *Id.* All such monthly reports filed, as well as the documentation evidencing payment of vouchers and requisitions relating to expenditures, "shall be available for public inspection . . . in the office of the chief clerk." *Id.* Certainly, Husband's monthly reports on file with the chief clerk are discoverable. However, both the Husband and Wife, in their supplemental briefs addressing House Rule 14, believe it has limited application in this case. They note that it applies only to very specific and rather limited disbursements made to House members and that the limited information available concerning Husband's expenses would provide only a portion of the information requested by Wife under subparagraph (c) of the subpoena ("any and all expense account docu-

---

6. Published at http://www2.legis.state.pa.us/WU01/LI/BI/BT/2005/0/HR0001P0113.pdf (2005-06 session).

380

mentation"). Both parties agree Rule 14 is not applicable to the requests in (a) (for calendars and date books) or (b) (bank statements, cancelled checks and check registers). As such, the existence of this Rule may not resolve all the issues before the court nor provide any basis for limiting the Wife's access to the items sought in her subpoena.

Accordingly, this court issued an order July 1, 2005, denying the motion to quash.