# [J-82-2016] [M.O. - Wecht, J.]
## IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | |
|---|---|
| WILLIAM PENN SCHOOL DISTRICT; PANTHER VALLEY SCHOOL DISTRICT; THE SCHOOL DISTRICT OF LANCASTER; GREATER JOHNSTOWN SCHOOL DISTRICT; WILKES-BARRE AREA SCHOOL DISTRICT; SHENANDOAH VALLEY SCHOOL DISTRICT; JAMELLA AND BRYANT MILLER, PARENTS OF K.M., A MINOR; SHEILA ARMSTRONG, PARENT OF S.A., MINOR; TYESHA STRICKLAND, PARENT OF E.T., MINOR; ANGEL MARTINEZ, PARENT OF A.M., MINOR; BARBARA NEMETH, PARENT OF C.M., MINOR; TRACEY HUGHES, PARENT OF P.M.H., MINOR; PENNSYLVANIA ASSOCIATION OF RURAL AND SMALL SCHOOLS; AND THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE-PENNSYLVANIA STATE CONFERENCE | : No. 46 MAP 2015 : : : Appeal from the Order of the : Commonwealth Court entered on : 4/21/15 at No. 587 MD 2014 : : : : ARGUED: September 13, 2016 : : : : : : : : : : : : : : : : |
| Appellants | : : |
| v. | : : : : |
| PENNSYLVANIA DEPARTMENT OF EDUCATION; JOSEPH B. SCARNATI III, IN HIS OFFICIAL CAPACITY AS PRESIDENT PRO-TEMPORE OF THE PENNSYLVANIA SENATE; MICHAEL C. TURZAI, IN HIS OFFICIAL CAPACITY AS THE SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; TOM WOLF IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA; | : : : : : : : : : : : : : |

PENNSYLVANIA STATE BOARD OF : 
EDUCATION; AND PEDRO A. RIVERA, : 
IN HIS OFFICIAL CAPACITY AS THE : 
SECRETARY OF EDUCATION : 
 : 
                Appellees : 

## DISSENTING OPINION

**CHIEF JUSTICE SAYLOR**                 **DECIDED: September 28, 2017**

I respectfully dissent, as I would find that, per this Court's prior decisions, resolution of the claim asserted under the Education Clause is entrusted to the political branches, and that the issue is, accordingly, non-justiciable. Notably, the parties do not ask that we overrule binding precedent in this regard.

Separately, I would conclude that the Petition fails to make out a viable cause of action under the equal protection requirement of the state charter.

Therefore, I would affirm the Commonwealth Court's order sustaining the Respondents' demurrers and dismissing the Petition.

## I. Background

As the majority notes, several school districts, parents of children attending public schools, the Pennsylvania Association of Rural and Small Schools ("PARSS"), and the Pennsylvania State Conference of the NAACP (collectively, "Plaintiffs") filed a petition for review in the nature of an action for declaratory and injunctive relief (the "Petition") in the Commonwealth Court's original jurisdiction. They named as respondents Pennsylvania's Governor, Department of Education (the "Department"), acting Secretary of Education, and Board of Education (the "Board") (collectively, the

"Executive Defendants"), as well as the Speaker of the Pennsylvania House and the President Pro Tempore of the Pennsylvania Senate (the "Legislative Defendants").[1]

The majority sets out the background to this litigation in some detail. To summarize, according to the Petition Pennsylvania school districts are supported by a combination of local, state, and federal funds, with local sources contributing the greatest portion. In one recent fiscal year, for example, local sources provided 53% of public-education funding, state appropriations accounted for 34%, and the remaining 13% was furnished by the federal government. Because local school tax revenues depend on the total value of the real estate in a school district, wealthier districts can raise more money locally than poorer ones. The state contribution is calculated using a formula designed to moderate this disparity by providing more money to poor districts than to wealthy ones. Significant discrepancies in per-pupil spending nonetheless persist due to substantial wealth disparities among school districts and the overall scheme's heavy reliance on local taxation, even though many less-affluent districts expend greater tax effort (*i.e.*, impose higher tax rates) than wealthier ones.

In 2006 the Legislature directed the Board to determine the cost of providing students with the basic instruction necessary to achieve baseline educational standards as set forth by the state.[2] The resulting costing-out study, conducted by a private

---

[1] As the Petition was dismissed on a demurrer, the facts as summarized below are drawn from it and developed favorably to Plaintiffs. *See Gresik v. PA Partners*, 613 Pa. 303, 304 n.1, 33 A.3d 594, 595 n.1 (2011). We accept all well-pleaded facts in the Petition and all reasonable inferences drawn from them. *See Small v. Horn*, 554 Pa. 600, 608, 722 A.2d 664, 668 (1998).

[2] The Board is the Department's regulatory and policy-making entity for basic and higher education. It adopts standards to facilitate improved student achievement and issues reports and recommendations giving guidance to the governor and school districts. *See* 24 P.S. §26-2603-B; 22 Pa. Code §4.2.

contractor with Board oversight, estimated that the per-student cost to attain these mandates was approximately $11,900, whereas the average amount being spent was about $9,500. The aggregate cost to meet the standards was determined to be $21.6 billion – 25% more than the amount being spent. The study also found that 94% of Pennsylvania's 500 school districts were spending less than their costing-out estimate and that the poorest 20% of school districts needed to increase spending by 38%, whereas the wealthiest 20% of school districts only needed to increase spending by 7%.

To address these shortfalls, the General Assembly passed Act 61 of 2008, which increased funding for basic education and implemented a new formula for determining the amount of state funding to be disbursed to each school district. Act 61 also increased monies for basic education by $275 million in 2008 and was intended to be the first step of a six-year plan to assist school districts in meeting the state's adequacy objectives. The formula was used in 2009 and 2010 to determine both the aggregate state appropriation and its distribution among school districts. Overall state education funding increased by $655 million between 2008 and 2010. To supply this increase, the Commonwealth began relying on federal stimulus dollars available under the American Recovery and Reinvestment Act of 2009, and it used these funds to replace state-raised revenue that had previously been appropriated to education.

The stimulus money expired in 2011. By that time the state had substituted $480 million in federal funds for state revenues targeted to basic education. By June 2011, Pennsylvania faced the prospect of finding a replacement for approximately $1 billion in federal stimulus monies in its overall fiscal-year 2011-12 budget. Instead of supplying $1 billion in new state funds, however, the Legislature implemented $860 million in budget cuts which encompassed reductions for programs supporting public education. At this juncture, Act 61's multi-year funding formula was abandoned in favor of a

formula to be decided upon annually going forward. Although later spending increases ameliorated some of the 2011 budget cuts, the present budget reflects a $580-million reduction in state education spending as compared to the period ending in June 2011, which is well below the levels reflected in the costing-out study. At the same time, school districts' ability to raise new local taxes to fill the void has been limited under the Taxpayer Relief Act of 2006. Pursuant to that legislation, school districts are generally precluded from raising real-estate taxes beyond a cost-of-living index as calculated by the Department. Because the index is expressed as a percentage, such potential increases are lower in low-wealth districts than in high-wealth districts.

Meanwhile, beginning in 1999 and pursuant to legislative authorization, the Board promulgated regulations setting forth, and ultimately expanding upon, statewide academic standards which specify what schoolchildren should be taught in a variety of subjects. Additionally, statewide standardized testing was established in the form of the Pennsylvania System of School Assessment ("PSSA") and the Keystone exams. Although PSSA and other standardized exams had existed before 1999, the 1999 changes made the standards more concrete. Later, in 2014, the Board implemented the Pennsylvania Common Core Standards, which replaced the academic standards in math, English, language arts, and literacy, but left in place the pre-existing standards for other subject areas. The standards are not merely aspirational, as students may have to retake exams they fail as a requirement for graduation, and school districts, as well as their teachers and administrators, are evaluated on whether students are meeting state standards.

As a result, the gap between state adequacy targets and academic achievement in the subject school districts (*i.e.*, the plaintiff school districts, PARSS member districts, and districts containing schools attended by children of individual plaintiffs) has

widened. In particular, many students in these low-wealth districts are unable to meet state proficiency standards on the Keystone and PSSA tests, and some districts have eliminated courses and programs that would otherwise have helped improve student performance on those exams. Also, some pupils in poor districts require higher-than-average funding due to conditions associated with poverty or the fact that English is not their first language. School districts with significant monetary shortfalls, moreover, have insufficient and undertrained staff, as well as inferior equipment, facilities, and materials. In these districts, there is often inadequate pre-kindergarten program funding, meaning that the district must choose between spending less or using general operating funds to provide such pre-kindergarten programs.

Based on these allegations, the Petition set forth two counts. In Count I, Plaintiffs claimed Defendants had violated their duties under the Education Clause, which requires that the General Assembly "provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." PA. CONST. art. III, §14.[3] In this regard, they alleged that Defendants had defined the content of an adequate education – *i.e.*, one that will "serve the needs of the Commonwealth" – via the promulgation of academic standards assessed pursuant to the PSSA and Keystone exams. They added that the state Common Core standards "set forth a prescribed course of study and a uniform educational progression from grade to grade, and form a core, fundamental element of the Commonwealth's current system of public education." Petition ¶303. Plaintiffs averred that Defendants

---

[3] The Education Clause first appeared substantially in its present form in the 1874 Constitution, at which time it directed the Legislature to "provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of this Commonwealth above the age of six years may be educated, and [to] appropriate at least one million dollars each year for that purpose." PA. CONST. art. X, §1 (1874).

failed to provide the school districts in question with enough funding to ensure that all students have an opportunity to receive an adequate education – where adequacy is measured by whether the students are prepared to "meet state academic standards" and to achieve "civic, economic, and social success" beyond school. *Id.* ¶304. Plaintiffs maintained that the current levels and allocation of school funding "are irrational, arbitrary, and not reasonably calculated to ensure that all Pennsylvania schoolchildren have access to an adequate education[.]" *Id.* ¶305.

In Count II, Plaintiffs relied on Pennsylvania's Equal Protection Clause as a basis for relief. *See* PA. CONST. art. III, §32.[4] They asserted that education is a fundamental right and, as a corollary, the state government has an obligation to ensure all students have an equal opportunity to obtain an adequate education. Thus, Plaintiffs alleged that the state charter prohibits the Legislative Defendants from enacting laws that benefit a select few. In this respect, Plaintiffs contended that many funding methodologies exist which would support the state's interest in preserving local control of public education without discriminating against students in low-wealth school districts. Plaintiffs alleged that Defendants had violated Section 32 by adopting a school funding program that discriminates against students living in such districts by denying them an equal opportunity to obtain an adequate education. *See id.* ¶¶308-311.

In terms of relief, Plaintiffs asked the court to declare that: public education is a fundamental right of all schoolchildren in Pennsylvania; the Education Clause imposes on Defendants an obligation to adopt a school-financing arrangement which (i) is

---

[4] Section 32 prohibits local or special laws in cases that can be provided for by general laws, and it expressly precludes local or special laws regulating the affairs of school districts. This Court has stated that Section 32 is substantially coterminous with the federal Equal Protection Clause. *See Balt. & Ohio R. Co. v. Dep't of Labor & Indus.*, 461 Pa. 68, 83, 334 A.2d 636, 643 (1975). In this opinion, all subsequent references to the Equal Protection Clause pertain to Article III, Section 32, unless otherwise noted.

reasonably calculated to ensure – and does ensure – that all schoolchildren can obtain an education which enables them to meet state academic standards and participate meaningfully in society, and (ii) does not discriminate against students who live in low-income, low-property-value school districts; the present arrangement violates the Education Clause as well as Plaintiffs' rights under the Equal Protection Clause by giving students in high-wealth districts an opportunity to attain an adequate education while denying the same opportunity to students in low-wealth districts; and no compelling state interest justifies the existing funding disparity between those two categories of school districts.  *See id.* ¶¶312-19.

Plaintiffs also requested injunctive relief, specifically, permanent injunctions directing Respondents to develop and maintain a system which provides an equal opportunity to all students to obtain an education meeting academic standards and societal participation.  Finally, Plaintiffs asked the Commonwealth Court to retain jurisdiction to ensure Defendants' ultimate compliance with the contemplated injunctions.  *See id.* ¶¶320-24.

The Legislative and Executive Defendants each filed preliminary objections in the nature of a demurrer.  *See* Pa.R.C.P. No. 1028(a)(4).  Defendants averred primarily that Plaintiffs' claims present non-justiciable political questions.  They maintained, in this respect, that there are no judicially manageable standards for granting relief.  Defendants also argued that Plaintiffs failed to state a claim for which relief may be granted because the existing statutory scheme rationally serves the state's interest, per the Education Clause, in maintaining and supporting a thorough and efficient system of public education.  As well, Defendants suggested that Plaintiffs' claims under the Equal Protection Clause were legally insufficient because education is not a fundamental right subject to strict scrutiny, and the present funding system rationally serves the

government's interest in preserving local control over public education. Finally, Defendants averred that Plaintiffs' causes of action were barred by sovereign immunity – to the extent they sought mandatory injunctive relief – as well as the separation of powers doctrine insofar as they were asking the judicial branch to compel action by the General Assembly and to subject it to ongoing court supervision.

In a unanimous, published decision, the Commonwealth Court sustained the preliminary objections and dismissed the Petition on the grounds that, pursuant to this Court's precedent, the claims under both the Education and Equal Protection Clauses raised non-justiciable political questions. *See William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 114 A.3d 456, 464 & n.15 (Pa. Cmwlth. 2015) (*en banc*).

Initially, the Commonwealth Court observed that this Court has referenced the considerations listed in *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691 (1962), to ascertain whether the political question doctrine counsels in favor of abstention in a given case. *See William Penn Sch. Dist.*, 114 A.3d at 462 (citing *Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977), and quoting *Robinson Twp. v. Commonwealth*, 623 Pa. 564, 608-09, 83 A.3d 901, 928 (2013)).[5] Rather than analyzing the *Baker* factors, however, the Commonwealth Court stated that the justiciability issue was decided in *Marrero v. Commonwealth*, 559 Pa. 14, 739 A.2d 110 (1999) ("Marrero II"), where this Court held that the political question doctrine precluded review of an Education Clause challenge to the state's public school funding scheme, and *Danson v. Casey*, 484 Pa. 415, 399 A.2d 360 (1979), in which the Court determined that claims under the Education and Equal Protection Clauses failed to state a justiciable cause of action. The Commonwealth Court rejected Plaintiffs' attempt to distinguish *Marrero II* based on subsequently-

_____

[5] *See also* Majority Opinion, *slip op.* at 29 n.28 (enumerating the *Baker* factors and observing that the presence of any one factor is sufficient for abstention under the political question doctrine).

adopted education standards and assessments, reasoning that such factors may establish policy-related benchmarks, but they cannot supply courts with judicially manageable standards to determine whether the Legislature has fulfilled its constitutional duties. *See William Penn Sch. Dist.*, 114 A.3d at 463.

Plaintiffs appealed, primarily questioning whether the political question doctrine should be understood to preclude a merits disposition of a petition which: alleges that the state government is in violation of the Education Clause because its school-funding scheme "bears no relationship" to the cost of preparing students to meet state academic standards; and avers, as well, that the existing funding system violates the Equal Protection Clause due to "gross and irrational disparities" in funding between low-wealth and high-wealth school districts. Brief for Appellants at 2.[6]

This Court has exclusive appellate jurisdiction. *See* 42 Pa.C.S. §723(a). We undertake *de novo* review, assessing whether the law says with certainty that relief is unavailable. *See Bruno v. Erie Ins. Co.*, 630 Pa. 79, 91, 106 A.3d 48, 56 (2014).

## II. The Education Clause Claim

Plaintiffs contend that the Commonwealth Court's decision should be reversed because this Court has never adopted a *per se* rule that Education Clause claims are non-justiciable, and hence, the Commonwealth Court erred by interpreting *Marrero II* as establishing such a rule. They suggest that the *Baker* factors do not support abstention in this case, and even if they did, any separation-of-powers concerns are overridden by

---

[6] The City of Philadelphia, as well as several individuals and organizations have filed *amicus* briefs supporting Plaintiffs' position, including: the Philadelphia Federation of Teachers, Local 3, of the American Federation of Teachers, AFL-CIO, together with the American Federation of Teachers Pennsylvania AFT, AFL-CIO; two separate groups of youth, education, and civil rights advocacy associations led, respectively, by Public Citizens for Children and Youth and the Consortium for Public Education; and a group of individual law professors.

the need to vindicate what they describe as the fundamental right of schoolchildren to receive an adequate public education. *See* Brief for Appellants at 27, 43-44.

As to the *Baker* factors specifically, Plaintiffs make three arguments.[7] Regarding the first factor – whether there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department" – Plaintiffs assert that the wording of the Education Clause does not authorize the General Assembly to monitor the propriety of its own education-funding scheme. Plaintiffs also posit that the history underlying the Clause does not support such self-monitoring because its language was developed in response to public discontent with the lack of state support for schools in poor communities, which was having an adverse effect on the quality of education delivered in those geographical areas. *See id.* at 29-32.

Addressing the second *Baker* factor – whether there are "judicially manageable standards for resolving" the constitutional challenge – Plaintiffs argue that, unlike when *Marrero II* was decided, academic criteria and assessments now supply judicial standards to determine whether education funding levels bear a reasonable relation to satisfying the Education Clause's dictates. They note that other states have used similar educational benchmarks in determining whether their respective legislatures have complied with their constitutional duties. Acknowledging that a small number of underperforming school districts could reflect local mismanagement or ineffective teachers, Plaintiffs reason that the systemic failure of Pennsylvania's school districts to satisfy established academic criteria proves that the current funding scheme violates the Education Clause. *See id.* at 14-15, 36 (providing student pass-rates on the Keystone and PSSA exams). Plaintiffs also reference the costing-out study as evidence that the

---

[7] Generally, only the first three *Baker* factors are at issue in Education Clause cases.

cost of providing each student with an opportunity to meet state standards is now measurable. *See id.* at 32-39.

With respect to the third *Baker* factor – whether it is "impossibl[e]" for the court to decide the issue "without an initial policy determination of a kind clearly for nonjudicial discretion" – Plaintiffs argue that resolving their claim would not require this Court to make a policy judgment as to what constitutes an adequate education since Defendants have already done so by adopting the referenced standards and assessments. Further, they advance that the type of declaration they are seeking would not immerse the judiciary in the minutiae of educational policy choices such as class sizes or textbook requirements. Rather, in Plaintiffs' view, since they are seeking a declaratory judgment that Defendants have failed to meet their obligations under the Education Clause, the Court can simply decide whether the public school funding scheme Defendants have adopted is constitutional – an inherently judicial task. *See id.* at 39-41.

Insofar as Plaintiffs are also seeking injunctive relief, they propose that this Court follow the lead of other state courts which have imposed deadlines for compliance, as well as consequences, such as large daily fines levied against the legislative body for failure to comply in a timely manner, and required ongoing judicial monitoring of that body. They contend that, in a number of cases, the judicial finding of a constitutional violation has itself motivated the political branches to formulate and implement a solution within a reasonable timeframe. *See id.* at 41-43.

In response, the Executive Defendants reference pronouncements from the United States Supreme Court and this Court reflecting that the judicial branch is institutionally ill-suited to formulate or evaluate policy choices relating to local public schools, as it is unable to gauge what constitutes an adequate education or what funds are necessary to meet educational goals. *See* Brief for Executive Appellees at 17-20

(quoting, *inter alia*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 41, 93 S. Ct. 1278, 1301 (1973), and *Wilson v. Sch. Dist. of Phila.*, 328 Pa. 225, 236-37, 195 A. 90, 97 (1937)). Based on *Danson* and *Marrero II*, they reason, more particularly, that issues implicating the design and funding of the public education system are committed solely to the General Assembly. The Executive Defendants observe that, unlike some of the *amici*, Plaintiffs do not ask that *Marrero II* be reconsidered, but rather, attempt to distinguish it based on educational assessments and standards adopted after 1999. They therefore posit that reconsidering *Marrero II* is not before this Court, as arguments made by *amici* do not comprise party arguments. *See id.* at 20-22.

With regard to Plaintiffs' contention that this case may be distinguished from *Danson* and *Marrero II* because the latest educational assessments and the monetary amounts in the costing-out study can serve as judicially manageable standards, the Executive Defendants note that, as reflected in administrative regulations, statewide assessments and standards have existed since the late 1960s, well before *Danson* and *Marrero II*. According to the Executive Defendants, such items are imbued with political judgments subject to change by future policymakers – and this includes the costing-out study, which incorporates policy choices regarding acceptable proficiency levels in various academic subjects. *See id.* at 25 (quoting *Hancock v. Comm'r of Educ.*, 822 N.E.2d 1134, 1136 (Mass. 2005) (plurality) (suggesting that costing-out studies are "rife with policy choices that are properly the Legislature's domain")).

More generally, the Executive Defendants reason that utilizing the most recent standards issued by the political branches as judicial guides would be unmanageable and would bind future legislators to current legislative thinking – contrary to the precept that the "essence" of the Education Clause is to enable free experimentation by the Legislature. *Teachers' Tenure Act Cases*, 329 Pa. 213, 224, 197 A. 344, 352 (1938);

*Danson*, 484 Pa. at 426, 399 A.2d at 366. They state that, in view of Plaintiffs' request for continuing court oversight, a failure to abstain would cause courts to supervise ever-changing educational standards, thus entangling courts with policy matters such as exam cut-off scores and acceptable district-wide pass rates. *See* Brief for Executive Appellees at 23-29. Along these lines, the Executive Defendants contend that courts which have used educational assessments as judicial guides have become mired in education policy and have extended their reach beyond the constitutionality of public-school funding schemes. *See id.* at 29-31 (discussing the experiences of courts in California, New Jersey, New Hampshire, Kansas, and Nebraska).

Alternatively, the Executive Defendants argue that the Petition fails to state a claim upon which relief can be granted, as there is no reasonable argument that the Commonwealth's public education scheme does not bear a reasonable relation to complying with the Education Clause. *See id.* at 37-39. They also contend that, because Plaintiffs seek a mandatory injunction compelling a new public education framework, their suit is barred under the doctrine of sovereign immunity. *See id.* at 39-41. Finally, the Executive Defendants assert that granting Plaintiffs' request to compel the General Assembly to enact specific legislation would violate the separation-of-powers doctrine. *See id.* at 41-42.

The Legislative Defendants add that the crux of Plaintiffs' complaint – *i.e.*, that Pennsylvania's public-education funding system is irrational and underfunded, and discriminates against certain students – is the same claim that *Danson* and *Marrero II* rejected. They view *Danson* and *Marrero II*, together, as standing for the position that, so long as the established funding scheme bears a reasonable relation to the provision

of a thorough and efficient system of education, courts may not intrude on that scheme.[8] Because *Marrero II*, which built upon *Danson*, concluded that a reasonable relation did, in fact, exist by virtue of the present system of funding schools via a combination of local taxes, state appropriations, and federal grants, the Legislative Branch Defendants contend Plaintiffs raise no new issue to consider.

The Legislative Defendants advance, in this regard, that the extra-jurisdictional judicial decisions which Plaintiffs reference are immaterial since *Danson* and *Marrero II* are dispositive in relation to Pennsylvania's system. To the degree Plaintiffs rely on such decisions to imply *Danson* and *Marrero II* should be reconsidered, the Legislative Defendants submit that the doctrine of *stare decisis* weighs against reconsideration. They indicate this is true generally, and in this case particularly so, since various education stakeholders have acted in reliance on *Danson* and *Marrero II*, and these actors would only have a voice concerning contemplated changes in a legislative forum. *See* Brief for Legislative Appellees at 10-27. Regardless, the Legislative Defendants maintain, in recent years a number of appellate courts in other jurisdictions have issued holdings in line with *Marrero II* because, although the text and history of their constitutional provisions may vary, they have developed a "keen awareness of the perils of supplanting [the] legislative process with judicial activism." *Id.* at 23.

Finally, the Legislative Defendants refute any suggestion that this Court has altered its analysis of political-question claims, asserting the *Baker* factors remain the central focus of such claims, and the circumstance that this Court has declined to

---

[8] The Legislative Defendants fault Plaintiffs for allegedly attempting to change the issue to whether the funding scheme bears a reasonable relation to providing students with an opportunity to meet state standards, rather than providing for the maintenance and support of a thorough and efficient *system* of public schools. *See* Brief for Legislative Appellees at 12 n.6. In light of the treatment of the "reasonable relation" standard below, any such distinction is immaterial to the present appeal.

abstain under the political-question doctrine in other contexts bears little relevance to the continuing vitality of *Danson* and *Marrero II*. They note that, except with respect to judicial funding issues, Pennsylvania courts have shown a strong predisposition against "second guessing" the General Assembly's budgetary decisions. *Id.* at 21 (citing *Pa. Envtl. Def. Found. v. Commonwealth*, 108 A.3d 140, 166 (Pa. Cmwlth. 2015)).

After oral argument Governor Wolf filed a supplemental brief addressing recent legislation, namely, the Act of June 1, 2016, P.L. 252, No. 35 ("Act 35"), which added provisions to the Public School Code of 1949,[9] *see* 24 P.S. §§1-124, 25-2502.53, 25-2502.54, and appropriated supplemental funds for basic education. According to the Governor, Act 35 works a significant change to the school-funding landscape because school districts will now receive from the state both a basic subsidy and an additional substantial grant pursuant to a "fair-funding formula" which accounts for "district-specific factors, such as local taxing/revenue-generating capacity, student population size and density, and specific student-related indices, including the number of children . . . who live in poverty." Supplemental Brief for Governor Wolf at 3. He represents that every new dollar in state education funding going forward will be distributed per the fair-funding formula. The Governor concludes that Act 35 illustrates that appropriating and distributing education funds involves "inherently and necessarily political questions that are beyond the jurisdiction of this Court," and, as such, Plaintiffs seek relief which would intrude on the prerogatives of the government's political branches. *Id.* at 5.

In a responsive brief, Plaintiffs agree that the fair-funding formula distributes funds equitably, but they contend that the percentage of state education money subject to the formula is too small to remediate the underlying circumstance that public school

---

[9] Act of Mar. 10, 1949, P.L. 30 (as amended 24 P.S. §§1-101 to 27-2702) (the "School Code").

funding is overly reliant on property taxes – with the result that such funding remains inequitable and inadequate even in the wake of Act 35. Overall, Plaintiffs argue that the Governor's advocacy shows that the needs of each school district are, in fact, capable of objective determination (thus undercutting Defendants' non-justiciability argument), and that the issue of whether Act 35 provides for an adequate education for the state's schoolchildren is fundamentally a question of fact to be resolved at trial.

"Ordinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers," *Sweeney*, 473 Pa. at 508, 375 A.2d at 705 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)), inasmuch as it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177. "Sometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness – because the question is entrusted to one of the political branches[.]" *Veith v. Jubelirer*, 541 U.S. 267, 277, 124 S. Ct. 1769, 1776 (2004) (plurality).[10]

Pennsylvania courts have historically been reluctant to intervene when faced with complaints alleging the General Assembly has failed to fulfill its Education Clause obligations. Abstention as to questions concerning the adequacy of public education generally dates as far back as the mid-1800s. The concept was invoked relative to the earlier version of the Education Clause which appeared in the Constitutions of 1790 and 1838 and directed that "[t]he legislature shall, as soon as conveniently may be, provide by law for the establishment of schools throughout the state, in such manner that the poor may be taught gratis." PA. CONST. art VII, §1 (1790, 1838). In *Commonwealth v.*

---

[10] The political question doctrine is one of several that "have evolved to give body to the general notions of case or controversy and justiciability." *Rendell v. Pa. State Ethics Comm'n*, 603 Pa. 292, 307, 983 A.2d 708, 717 (2009). Others include standing, ripeness, and mootness. *See id.*

*Hartman*, 17 Pa. (5 Harris) 118, (1851), the Court noted that the Constitution permitted the Legislature to "provide for a system of general education in any way which they, in their own wisdom, may think best," and added that even if an education-related statute was "unjust in its operation," "the remedy lies, not in an appeal to the judiciary, but to the people, who must apply the corrective themselves[.]" *Id.* at 119, *quoted in Marrero v. Commonwealth*, 709 A.2d 956, 966 n.21 (Pa. Cmwlth. 1998) ("Marrero I"), *aff'd*, 559 Pa. 14, 739 A.2d 110 (1999).[11]

With regard to the 1874 Education Clause – the first version to require support for a "thorough and efficient" system, *see supra* note 3 – litigation initially focused on whether school board decisions were judicially reviewable, with the Court concluding that they were not, at least absent a gross abuse of discretion such as an unexcused failure to provide for any public education.[12] *See Nicklas v. Kaltenbaugh*, 146 Pa. 212, 220, 23 A. 316, 316 (1892); *see also Roth v. Marshall*, 158 Pa. 272, 273-74, 27 A. 945, 945 (1893) (expressing that a school board's exercise of its discretion is generally a

---

[11] *See also Pa. Ass'n of Rural & Small Schs. v. Ridge*, No. 11 M.D. 1991, *slip op.* at 118 n.70 (Pa. Cmwlth. July 9, 1998) ("PARSS") (single-judge opinion) (observing that the judiciary's reluctance to involve itself in the public school system "has a long history" (citing *Wharton v. Cass Twp. Sch. Dirs.*, 42 Pa. 358, 364 (1862))), *aff'd per curiam*, 558 Pa. 374, 737 A.2d 246 (1999), *reprinted in* Brief for Appellants at Addendum B.

The *PARSS* case and the *Marrero* litigation raised similar issues, and *PARSS* was also substantively similar to the present matter in that it raised Education Clause and Equal Protection Clause claims based on disparities in school funding. The Commonwealth Court in *PARSS* held a four-week trial, but it ultimately dismissed the claims as non-justiciable based on the intervening decision in *Marrero I*. This Court summarily affirmed *PARSS* the same day it decided *Marrero II*.

[12] Although the Education Clause places obligations upon the Legislature, school districts (which are legislatively created), including their governing boards, comprise an important means by which that body fulfills such obligations.

political matter to be remedied, if necessary, at the ballot box). *See generally Wilson*, 328 Pa. at 236-37, 195 A. at 97 (elaborating on these observations).

Later, in *Teachers' Tenure Act*, several school districts challenged the validity of the Teachers' Tenure Act of 1937 as impairing, in violation of the Contracts Clause, the obligations of their existing contracts with professional school employees. This Court found that the Education Clause saved the statute because the Clause embodies the concept that public-school teacher contracts are impliedly qualified by the possibility of future legislative modification. *See Teachers' Tenure Act*, 329 Pa. at 228, 197 A. at 354. In reaching this holding, the Court discussed the nature of public education in Pennsylvania and the judiciary's role in evaluating statewide enactments (as opposed to local school board decisions) under the Education Clause. It explained initially that the electorate, in approving the Clause, had given an affirmative mandate to the Legislature which the latter had no discretion to ignore. The Court then developed that, by their nature, educational methodologies evolve over time, and any given General Assembly lacks the power to constrain future legislatures in matters of educational policy:

> [E]verything directly related to the maintenance of a 'thorough and efficient system of public schools,' must at all times be subject to future legislative control. One Legislature cannot bind the hands of a subsequent one; otherwise we will not have a thorough and efficient system of public schools.

*Id.* at 225, 197 A. at 352.

Thus, in light of the need for "successive Legislatures to adopt a changing program to keep abreast of educational advances," *id.* at 224, 197 A. at 352, the Court reasoned that, rather than inquiring into the wisdom or expediency of existing policy in matters of public education, the judiciary should limit itself to assessing whether the Commonwealth's education laws bear a "reasonable relation" to the purpose of the Education Clause – namely, providing for a thorough and efficient system of public

schools – and whether the "fruits or effects" of such laws might limit the ability of future legislatures to modify the school system in an effort to make it thorough and efficient. *Id.*

With the above as background, this Court first addressed a challenge brought directly pursuant to the Education Clause in *Danson*.[13]  There, the Philadelphia School District and several parents commenced an action against state education officials, alleging the district was underfunded to the point it would not be able to offer a "normal" educational program to its students.  They argued the statutory formula for state-level educational funding was unconstitutional and that no state money should be distributed until the formula was revised to ensure the school district received the funds it needed to operate its schools.  More broadly, the plaintiffs suggested that the state school-financing system failed to provide Philadelphia's schoolchildren with a thorough and efficient education and denied them equal educational opportunities solely due to their residence in Philadelphia.  *See Danson*, 484 Pa. at 420, 399 A.2d at 363.

The *Danson* Court responded by emphasizing that the Education Clause contemplates that future legislatures must always be free to experiment and adjust the state's public-education system, *see id.* at 426, 399 A.2d at 366 (describing this as "the very essence" of the Clause (quoting *Teachers' Tenure Act*, 329 Pa. at 224, 197 A. at 352)), and thus, it would be improper for a reviewing court to bind such legislatures to "a

_____

[13] This description of *Danson* as constituting the first Education-Clause-based challenge is in tension with the majority's suggestion that *Teachers' Tenure Act* "implicitly and necessarily treat[ed] a claimed violation of the Education Clause as justiciable." Majority Opinion, *slip op.* at 51.  Notably, *Teachers' Tenure Act* relied on the broad *authority* given to the legislative branch under the Education Clause as a basis for concluding that that branch remained free to alter education statutes in the future.  As such, *Teachers' Tenure Act* does not constitute precedent indicating that the type of claim asserted here – dealing with the Legislature's alleged *failure to fulfill its affirmative obligations* under the Education Clause – is justiciable.  *See infra* note 18.

present judicial view of a constitutionally required 'normal' program of educational services." *Id.* *Danson* added that, even if the Court were inclined to define a thorough and efficient education, the only judicially-manageable standard would be that the same dollar amount be expended on each student in the state. This, however, would read into the Education Clause a uniformity component which the framers expressly rejected in favor of local variation and control according to the needs of particular school districts, as well as the right of localities to raise additional taxes to expand their school offerings. *See id.* at 427, 399 A.2d at 366-67. *See generally Rodriguez*, 411 U.S. at 49-50, 93 S. Ct. at 1305 (expounding on the historical importance of local control and noting that it promotes "experimentation, innovation, and a healthy competition for educational excellence").[14] The Court thus held that

> the General Assembly has fulfilled its constitutional duty to the public school students of Philadelphia. The Legislature has enacted a financing scheme reasonably related to maintenance and support of a system of public education in the Commonwealth of Pennsylvania. The framework is neutral with regard to the School District of Philadelphia and provides it with its fair share of state subsidy funds.

*Danson*, 484 Pa. at 427-28, 399 A.2d at 367. Evidently applying the above reasonable-relation standard as a kind of minimal check as to legislative purpose (discussed in more detail below), *Danson* concluded that the plaintiffs had otherwise "failed to state a justiciable cause of action." *Id.* at 420, 399 A.2d at 363.

Twenty years later in *Marrero II*, another group of Philadelphia plaintiffs, again including the Philadelphia School District, lodged a similar complaint, asserting that the

---

[14] *See PARSS*, No. 11 M.D. 1991, *slip op.* at 98-100, 103-04 (discussing the proposed uniformity requirement and describing that the delegates at the 1873 Constitutional Convention rejected it in favor of a flexible system adaptable to the diverse local needs and conditions of Pennsylvania's school districts (citing and quoting II DEBATES OF THE CONVENTION TO AMEND THE CONSTITUTION OF PENNSYLVANIA 419-26 (1873))).

state had violated the Education Clause by failing to provide enough funding to the district. They argued that, due to its urban setting, the district was already financially overburdened and it was required to educate a disproportionate number of students living in poverty – students whose unique needs were alleged to require additional expenditures above and beyond the statewide norm. The plaintiffs claimed that the school district had a weak tax base which it could not rely on to generate the extra monies needed for its students, and thus, the General Assembly should be directed pursuant to the Education Clause to appropriate more funding to the district.

Drawing on *Danson*, *Marrero II* expounded that the Education Clause is limited in scope in that it only requires the Legislature to provide for a thorough and efficient *system* of public education, but it does not give students an *individual right* to a particular level or quality of education. *See Marrero II*, 559 Pa. at 17, 739 A.2d at 112. *Marrero II* also reiterated that: successive legislatures must remain at liberty to alter educational policy; the only judicially-manageable standard would be to require the same dollar expenditure per student (which would improperly import into the Education Clause a uniformity mandate); the deferential reasonable-relation standard governs such challenges; and courts should refrain from involvement as long as that standard is met. *See id.* at 17-19, 739 A.2d at 112-13. *Marrero II* found that the standard was met because the General Assembly had enacted a number of laws governing the funding and operation of the public school system throughout the Commonwealth, including in Philadelphia. *See id.* at 20, 739 A.2d at 113.

As to the political question doctrine, *Marrero II* observed that the Commonwealth Court had held that the first three *Baker* factors all required abstention. In particular, the Commonwealth Court determined that the Education Clause places sole responsibility for maintaining the state's public school system in the hands of the Legislature and, as

such, questions relating to what constitutes an "adequate" education or how much funding is needed are exclusively within the General Assembly's purview and "are not subject to intervention by the judicial branch[.]" *Marrero I*, 709 A.2d at 965-66. As a consequence, the court found that "prominent on the surface of the case" was a "textually demonstrable constitutional commitment of the issue to" the Assembly, there was a "lack of judicially manageable standards for resolving" the claims, and it would be impossible to resolve them "without making an initial policy determination of a kind which is clearly of legislative, and not judicial, discretion." *Id.* at 966 (citations omitted).

Notably, this Court approved and, in effect, adopted these determinations as its own. *See Marrero II*, 559 Pa. at 19-20, 739 A.2d at 113-14 (stating the Commonwealth Court's reasoning "discloses no error, but rather a conscientious adherence to precedent"). In concluding, *Marrero II* quoted with approval from *Marrero I* as follows:

> Thus, this court will not inquire into the reason, wisdom, or expediency of the legislative policy with regard to education, nor any matters relating to legislative determinations of school policy or the scope of educational activity. In short, as the [Pennsylvania] Supreme Court was unable to judicially define what constitutes a "normal program of educational services" in *Danson*, this court is likewise unable to judicially define what constitutes an "adequate" education or what funds are "adequate" to support such a program. *These are matters which are exclusively within the purview of the General Assembly's powers, and they are not subject to intervention by the judicial branch of our government.*

*Marrero II*, 559 Pa. at 20, 739 A.2d at 113-14 (quoting *Marrero I*, 709 A.2d at 965-66) (citation omitted, emphasis added); *see also Pa. Sch. Bds. Ass'n v. Commonwealth Ass'n of Sch. Adm'rs*, 569 Pa. 436, 461-62, 805 A.2d 476, 490-91 (2002) (rejecting an Education Clause challenge to a statute giving certain school administrators collective-bargaining rights because determining whether the statute would result in a failure to provide for a thorough and efficient system of education involved education-policy questions beyond the realm of the judiciary); *Reichley v. N. Penn Sch. Dist.*, 533 Pa.

519, 529, 626 A.2d 123, 129 (1993) (same as to an Education Clause challenge to a Public Employee Relations Act provision allowing labor strikes by teachers and other professional school employees). *See generally Ehret v. Sch. Dist. of Kulpmont*, 333 Pa. 518, 525, 5 A.2d 188, 192 (1939) (noting that under the Education Clause the Legislature is "empowered to determine what is 'efficient' in school management"). *But cf. Sch. Dist. of Phila. v. Twer*, 498 Pa. 429, 435, 447 A.2d 222, 225 (1982) (clarifying that courts are competent to review administrative interpretations of school-related legislation within the context of the Assembly's Education Clause responsibilities).

## A. The "thorough and efficient" requirement and justiciability

As can be seen from the brief history given above, the justiciability of claims asserting that the legislative scheme governing the amount and distribution of state public-education funding works an Education Clause violation is now well-trodden territory in Pennsylvania. There have been repeated pronouncements by this Court over eight decades that future Legislatures cannot be bound by a present judicial view of what constitutes a thorough and efficient system of public education. *Accord* 78 C.J.S. *Schs. & Sch. Dists.* §6 ("[A school] system may be changed, or one system substituted for another, as often as the legislature deems it necessary or expedient so to do."). When the Legislature adopts statewide academic standards, it bases its decisions on intensive scientific, fiscal, and practical considerations, as well as evolving political values. Because the General Assembly is institutionally better suited to understand and respond to those concerns than the judiciary, academic standards, which necessarily must change over time, do not provide a judicially manageable mechanism for oversight. In light of the reasoning and holdings reflected in *Danson*, *Marrero*, *Pennsylvania School Boards Association*, and *Reichley*, moreover, it is now

established that Education Clause claims generally raise political questions to be resolved through the political process.[15]

Nevertheless, Plaintiffs seek to distinguish *Danson* and *Marrero II* primarily on the basis that those decisions only found the issue before the Court non-justiciable under the specific facts alleged, whereas here, the *Baker* factors militate in favor of merits review since standards have now emerged – in the form of statewide academic performance goals and the costing-out study – by which to measure whether the General Assembly has fulfilled its duties under the Education Clause. Thus, as noted, Plaintiffs argue that the components of an adequate education have now been supplied legislatively and administratively, and that the costing-out study indicates the cost of providing all schoolchildren in Pennsylvania with a constitutionally-adequate education.

Initially, I would find Plaintiffs' reading of *Danson* and *Marrero II* unduly narrow. As reflected in the above-quoted passage, *Marrero II* clarified that the judiciary is not in a position to determine what constitutes an "adequate" education or how much money is needed to support a system capable of giving all schoolchildren in the state an opportunity to obtain one; these issues are within the exclusive province of the legislative branch. *See Marrero II*, 559 Pa. at 20, 739 A.2d at 113-14. As for *Danson*, that decision emphasized that, even if the judiciary could foresee future needs and "define the specific components of a thorough and efficient education," it would lack judicially-manageable standards to enforce legislative compliance because the only available measurement would be the dollar amount spent per pupil, whereas the education which students receive depends on other factors, including the way money is

---

[15] My conclusion in this regard is limited to the issue of justiciability and should not be understood as suggesting the Education Clause is permissive rather than mandatory.

spent and the manner in which the purchased resources are utilized. *Danson*, 484 Pa. at 427, 399 A.2d at 366 (internal quotation marks omitted).

To the extent Plaintiffs' position rests on the concept that legislative and administrative action in setting academic goals, implementing standardized tests, and commissioning a costing-out study can operate to create judicially-enforceable constitutional standards, I find such a premise problematic. The difficulty becomes apparent when one considers *how* these measures may translate into a judicial litmus capable of determining whether the Legislature's funding scheme, at a particular point in time, complies with the Education Clause. One possibility would be to constitutionalize the academic standards in place when the Petition was filed. This would mean overlaying the PSSA, Keystone, and Common Core targets onto the Education Clause as part of its substantive mandate. Such a holding would be in tension with the precept that future legislatures are always free to adopt new educational methodologies and alter their conception of what constitutes a thorough and efficient system of education. For their part, Petitioners clarify that this is not what they are requesting. *See* Reply Brief for Appellants at 12.

Another option – the one Plaintiffs do propose, *see id.* at 12-14 – is to conclude that, whenever the General Assembly and relevant state administrative bodies establish academic standards and associated assessment vehicles, those items reflect such entities' "current pronouncement of what a thorough and efficient system of public education should teach students[.]" *Id.* at 12 (internal quotation marks omitted). While this is certainly more plausible than the first option, judicial enforcement on such terms has multiple conceptual difficulties. It would read too much into legislative and administrative actions. Absent some indication by the political branches, it cannot be assumed that they view such items as reflecting the constitutional *minimum* (as

opposed to, for example, a system significantly exceeding that minimum). Thus, a holding along these lines would ascribe constitutional significance to educational policy decisions made at a specific time. *But cf. Idaho Schs. for Equal Educ. Opportunity v. Evans*, 850 P.2d 724, 734 (Idaho 1993) (upon examination of educational standards promulgated by the executive branch of the state government, holding that the standards' requirements as to textbooks, facilities, transportation, and instructional programs "are consistent with our view of thoroughness").

Neither the Education Clause, nor any other constitutional provision, indicates that standards set forth legislatively or administratively are to be viewed as subsuming a constitutional dimension. The Clause states in full: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." PA. CONST. art. III, §14. This may be compared with other state charters, some of which expressly constitutionalize standards set forth by law or regulation. *See* OR. CONST. art. VIII, §8(1) ("The Legislative Assembly shall appropriate in each biennium a sum of money sufficient to ensure that the state's system of public education *meets quality goals established by law . . .*" (emphasis added)); VA. CONST. art. VIII, §1, 2 (requiring the legislature to maintain a system of free schools with "high quality" educational programs, and specifying that quality standards are to be "determined and prescribed from time to time by the Board of Education, subject to revision only by the General Assembly"); *cf.* MISS. CONST. art. VIII, §201 (directing that the legislature provide for the maintenance of "free public schools upon such conditions and limitations as the Legislature may prescribe").

Unlike these provisions, our own Education Clause does not tether the required funding scheme to legislative or administrative "quality goals," "conditions," or "quality standards," nor does it otherwise contain descriptors beyond the adjectives "thorough"

and "efficient."  *See Neb. Coal. for Educ. Equity & Adequacy v. Heineman*, 731 N.W.2d 164, 180 (Neb. 2007) (interpreting the "paucity of standards" in Nebraska's education clause as reflecting the framers' "intent to commit the determination of adequate school funding solely to the Legislature's discretion, greater resources, and expertise").  Thus, although some other jurisdictions have relied on legislatively-devised benchmarks to provide constitutional content, *see, e.g.*, *Montoy v. State*, 120 P.3d 306, 309 (Kan. 2005), I believe this would read more into the Clause than the framers intended.

Another analytical difficulty involves the assumption that educational outcomes reflect the Assembly's efforts in providing for a thorough and efficient system.  A range of student scores will inevitably be reflected on standardized tests, and overall achievement levels will inevitably vary by district.  Sound reasoning dictates that student performance is determined, at least in part, by intangible factors such as parental support, a school environment conducive to learning, teacher quality, peer pressure, and effective administration.  *See City of Pawtucket v. Sundlun*, 662 A.2d 40, 59 (R.I. 1995) ("Recent studies have indicated that educational achievement by students is most clearly a function of parental involvement, not necessarily increased spending." (footnote omitted))*; cf. Rodriguez*, 411 U.S. at 42-43, 93 S. Ct. at 1302 (remarking on the controversy surrounding the correlation between spending and educational quality).[16]  Although additional funding may help, within this context it seems possible for the Legislature to fulfill its duty to "provide for" the maintenance and support of a thorough and efficient system and still be left with a system that underperforms due to

---

[16] *See generally Danson*, 484 Pa. at 427, 399 A.2d at 366 ("It must indeed be obvious that the same total educational and administrative expenditures by two school districts do not necessarily produce identical educational services.  The educational product is dependent upon many factors, including the wisdom of the expenditures as well as the efficiency and economy with which available resources are utilized.").

intractable social factors rather than constitutionally inadequate funding. Thus, to measure constitutional compliance (aside from mandating uniform per-pupil spending), Pennsylvania courts would have to account for these types of influences and determine whether identified performance shortfalls are due to inadequate funding or other factors beyond legislative control – a task it is ill-suited to perform.

To the extent accommodations in the standards are needed for districts with acute socioeconomic problems, the courts would need to engage in the legislative and administrative task of selecting acceptable threshold scores for each tested subject area as well as minimum district-wide proficiency rates based on a comprehensive picture of such conditions as they exist in each school district. Courts would also need to entertain debates concerning what is necessary, or merely optional, for an education to be considered adequate. *See generally Thompson v. Engelking*, 537 P.2d, 635, 656 (Idaho 1975) (Shepard, J., concurring) ("Arguments erupt at the drop of a hat as to what is or is not necessary in an educational system, what is or is not a frill . . . [; w]hat some denominate frills are asserted by others as necessary to the fullrounded education experience and enrichment of the future life of our children.") The judicial branch lacks the wherewithal to resolve these kinds of disputes. *See* Michael Heise, *The Courts, Educational Policy, & Unintended Consequences*, 11 CORNELL J.L. & PUB. POL'Y 633, 654 (2002) (hereinafter *Unintended Consequences*) ("Courts are structurally ill-equipped to make the sometimes delicate policy tradeoffs incident to the school finance enterprise."); *Comm. for Educ. Rights v. Edgar*, 672 N.E.2d 1178, 1193 (Ill. 1996) ("[T]he question of whether the educational institutions and services in Illinois are 'high quality' is outside the sphere of the judicial function."). Additionally, and as the highest court of one of our sister states has expressed,

> there are a multitude of policy decisions that go into state funding decisions, including consideration of federal mandates, the school

district's local efforts and ability to support its schools, and the State's ability to provide funding. In brief, it is beyond our ken to determine what is adequate funding for public schools.

*Heineman*, 731 N.W.2d at 181.

To the degree the costing-out study is claimed to have already taken into account the pertinent social, administrative, and other components and resolved these types of issues – thereby relieving the judiciary of any responsibility save directing the government to fund school districts at the levels reflected in the study – the Petition alleges that the study demonstrates the per-pupil cost of an education permitting students to meet the established performance standards. *See* Petition ¶¶3, 6, 12, 120, 121, 124, 126. As explained, however, those performance objectives cannot simply be equated with constitutional norms in relation to thoroughness and efficiency.

Plaintiffs' suggested approach has practical drawbacks as well. It would give rise to a situation in which a finding of unconstitutionality could be remedied by a lowering of the achievement parameters without altering the educational program being delivered. Relatedly, it could incentivize the political branches to set targeted proficiency levels artificially low, or dispense with them entirely, as a means of narrowing their legal exposure and avoiding judicial intervention. *See Unintended Consequences*, 11 CORNELL J.L. & PUB. POL'Y at 657-58 (referring to this phenomenon as "policymaking chill" and positing that "[r]ational assessments of otherwise desirable [education] policies could plausibly change if the effective cost of such a policy reaches the levels suggested by recent [judicial] finance decisions" in other states where the court used present educational standards as a baseline for determining constitutionally-required funding levels).[17] In this regard, and as noted, nothing in the text or history of the

---

[17] Plaintiffs contend it is unrealistic to suppose the legislative body would lower or eliminate statewide standards "to avoid its constitutional obligations." Reply Brief for Appellants at 13 n.8. Plaintiffs overlook that the Legislature may do so to free itself from (continued…)

Education Clause commands that the General Assembly enact statewide academic achievement standards or require school districts to administer standardized tests provided by the state. The approach suggested by Plaintiffs might thus do little to enforce Education Clause compliance and could ultimately prove counterproductive.

Finally, it should not be overlooked that any declaration that the Legislature is in violation of the Education Clause would have little practical effect absent judicial monitoring to ensure compliance with judicial directives. This circumstance is reflected in Plaintiffs' prayer for relief, in which they ask that the Commonwealth Court "[r]etain continuing jurisdiction over this matter until such time as [it] has determined that [Defendants] have, in fact, fully and properly fulfilled its orders." Petition ¶322. The judicial branch would then become entangled in ongoing school-funding litigation, requiring continuing oversight of a co-equal branch of government, *see, e.g.*, *Claremont Sch. Dist. v. Governor*, 794 A.2d 744, 760 (N.H. 2002) (noting that the parties had availed themselves of the court's continuing jurisdiction, resulting in eight subsequent state supreme court opinions in nine years), which, in turn, would be in tension with the separation-of-powers doctrine. *See Okla. Educ. Ass'n v. State*, 158 P.3d 1058, 1066 (Okla. 2007) (expressing that the plaintiffs' request to have the court monitor and oversee the legislative body would cause the court to invade that body's power to determine policy); *Ex Parte James*, 836 So. 2d 813, 819 (Ala. 2002) (*per curiam*) ("[A]ny

---

(…continued)
judicial oversight as it attempts to fulfill its obligations, or that it may ultimately conclude as a policy matter that standardized testing is counterproductive. *See* Lisa Kelly, *Yearning for Lake Wobegon: The Quest for the Best Test at the Expense of the Best Education*, 7 S. CAL. INTERDISC. L.J. 41, 42, 64-79 (1998) (arguing that a focus on standardized test results harms educational outcomes and deepens racial and class differences in academic achievement).

specific remedy that the judiciary could impose would, in order to be effective, necessarily involve a usurpation of that power entrusted exclusively to the Legislature.").

Upon review of similar disputes leading to protracted judicial oversight and litigation in other jurisdictions, I find resonance in the Nebraska Supreme Court's description that "[t]he landscape is littered with courts that have been bogged down in the legal quicksand of continuous litigation and challenges to their states' school funding systems." *Heineman*, 731 N.W.2d at 183; *see also id.* at 182-83 (discussing the difficulties encountered by courts in Arkansas, Kansas, Texas, Alabama, and New Jersey); *Sundlun*, 662 A.2d at 63 (expressing that the New Jersey Supreme Court's attempt to define what constitutes a "thorough and efficient" education has plunged that tribunal into a "morass," and concluding that the "volume of litigation [in New Jersey] and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a Legislature").

Accordingly, I believe we should continue to view the concept of an adequate education attainable via a thorough and efficient system as being a function of educational policy choices made by the Legislature and involving public policy concerns which are properly the domain of legislative discretion. *Accord Edgar*, 672 N.E.2d at 1191. Consistent with our precedent, therefore, I would hold that such matters are "exclusively within the purview of the General Assembly's powers, and they are not subject to intervention by the judicial branch of our government." *Marrero II*, 559 Pa. at 20, 739 A.2d at 114 (internal quotation marks and citation omitted).

## B. The reasonable-relation standard

As outlined above, the parties differ over whether the present education-funding legislation bears a "reasonable relation" to the provision of a thorough and efficient system of education. A review of the reasonable-relation standard as it developed for

Education Clause purposes reveals that its purpose has become distorted. In its phrasing it is similar to the "rational basis" standard applied in the equal protection and due process contexts – which pertains to whether a legislative classification is rationally related to the advancement of a legitimate state interest. The Court has indicated, however, that the reasonable-relation standard is even more deferential as it is only concerned with whether the legislation "relates to the *purpose* of" the Education Clause "without regard to the *way* the legislature has chosen to fulfill" that purpose. *Reichley*, 533 Pa. at 527, 626 A.2d at 128 (emphasis added).

Thus, beginning in *Danson* and continuing through *Marrero II*, the Court has employed the reasonable-relation litmus as a minimal test of legislative purpose – that is, to assess whether a conceptual or logical connection exists between the legislative scheme and the implementation of a statewide system of education. *See, e.g.*, *Danson*, 484 Pa. at 427, 399 A.2d at 367. Further, the Court has never invalidated an education-funding scheme on the grounds that it failed the reasonable-relation test. *Marrero II*, for example, held that the Legislature had satisfied the standard by enacting a number of laws directly relating to the operation and funding of the state's public school system. It did not undertake any analysis of whether the particular funding scheme was likely to make the system "thorough and efficient," as it considered that question to be political in nature and unsuitable to judicial determination. *See Marrero II*, 559 Pa. at 17-20, 739 A.2d at 112-14. Applied in this way, the reasonable-relation standard amounts to virtually no standard at all because any legislative scheme purportedly enacted to discharge the General Assembly's obligations under the Education Clause – including the School Code, *see Burger v. Bd. of Sch. Dirs. of McGuffey Sch. Dist.*, 576 Pa. 574, 584, 839 A.2d 1055, 1061 (2003) – will pass scrutiny regardless of whether a thorough and efficient system exists in reality or in name only.

This state of affairs raises doubts about whether the reasonable-relation standard was intended to be used in such a fashion. It is thus helpful to inquire how the standard originated in the Education Clause context and ascertain whether its later use comports with its initial purpose.

As discussed, *Teachers' Tenure Act* – the seminal case in this regard – involved a challenge to the Tenure Act based on a contention that the enactment impaired contractual obligations. *See Teachers' Tenure Act*, 329 Pa. at 223 & n.8, 197 A. at 352 & n.8 (quoting PA. CONST. art. I, §17 ("No . . . law impairing the obligation of contracts . . . shall be passed.")). The Court discussed the "power" conferred upon the Legislature by the Education Clause and determined that the Tenure Act was valid because it bore a "reasonable relation" to the purpose for which that power was given. *Id.* at 223-25, 197 A. at 352-53. *Teachers' Tenure Act*, in other words, used the reasonable-relation standard to assess whether the challenged legislation fell within the scope of legislative authority, not whether it fulfilled legislative obligations.[18]

The same dynamic was at work in *Reichley*. In that matter, the trial court found that labor strikes tend to disrupt public education. As a consequence, the trial court invalidated a portion of the Public Employee Relations Act permitting such strikes. Relying on the reasonable-relation standard, this Court reversed. The Court concluded that, because the legislation was aimed at resolving injurious labor disputes, it bore a reasonable relation to legislative authority as granted under the Education Clause.

This type of evaluation is not limited to the education arena. It has also been undertaken to evaluate whether a state statute constitutes an appropriate exercise of the state's police powers. To be a valid exercise, the act must bear a "rational relation

---

[18] By assigning a duty to the General Assembly, the Education Clause "both empowers and obligates." *Neely v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 778 (Tex. 2005) (internal quotation marks and citation omitted).

to public safety, health, morals or general welfare[.]"  *Appeal of Rolling Green Golf Club*, 374 Pa. 450, 454, 97 A.2d 523, 525 (1953) (internal quotation marks and citation omitted); *see also Price v. Smith*, 416 Pa. 560, 562-63, 207 A.2d 887, 888 (1965) (same as to local ordinances).

The federal cases are similar.  In *National Railroad Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 112 S. Ct. 1394 (1992), a taking accomplished pursuant to a federal statute was permissible so long as it was "rationally related" to a public use as required under the Fifth Amendment.  *Id.* at 422, 112 S. Ct. at 1404 (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 240-41, 104 S. Ct. 2321, 2329-30 (1984)).[19]  More recently, the Supreme Court noted that, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  *United States v. Comstock*, 560 U.S. 126, 134, 130 S. Ct. 1949, 1956 (2010); *see also id.* at 134-35, 130 S. Ct. at 1956-57 (citing cases).  *See generally Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 211, 83 S. Ct. 554, 589 (1963) (Stewart, J., dissenting) ("As with any other exercise of congressional power, a law which imposes deprivation of citizenship, to be constitutionally valid, must bear a rational relationship to an affirmative power possessed by Congress under the Constitution.").

In summary, then, the reasonable-relation test was not designed to evaluate whether a branch of state government has fulfilled its constitutional obligations.  It was

---

[19] *See also United States v. Clark*, 435 F.3d 1100, 1114 (9th Cir. 2006) (same as to Commerce Clause); *SEPTA v. PUC*, 826 F. Supp. 1506, 1520-21 (E.D. Pa. 1993) (same); *cf. Wisconsin v. City of N.Y.*, 517 U.S. 1, 19, 116 S. Ct. 1091, 1101 (1996) (evaluating whether administrative action was constitutional by asking whether it was reasonably related Congress's constitutionally-conferred authority).

wrongly applied in this way in *Danson* and *Marrero II*, and the experience of those cases teaches that the standard has little efficacy as means of enforcing legislative obligations in any event. Instead, the litmus, when applied properly, is utilized to ascertain whether the government has the authority to legislate, or otherwise act, in the manner subject to challenge, as reflected in *Teachers' Tenure Act*, *Reichley*, and federal cases such as those discussed above.

In the present controversy, the substance of Plaintiffs' allegations is that the political branches have not acted sufficiently to fulfill their duties, not that they have acted beyond the authority assigned to them by the state charter. The parties' opposing arguments concerning whether the reasonable-relation standard is currently satisfied are therefore misplaced. I would thus conclude that any present reference to the reasonable-relation standard cannot provide an independent basis for relief.

### III. The Equal Protection Clause Claim

Plaintiffs also contend that the Commonwealth Court erred in holding that their equal protection claim was barred under the political question doctrine. They note that, although *Danson* denied relief on such a claim, its analysis reflects a merits disposition based on the challengers' failure to assert gross disparities in funding among school districts. Plaintiffs argue they, by contrast, allege that these types of disparities exist because poorer school districts have a pronounced disadvantage in raising local revenue as compared to wealthier ones notwithstanding that the former often have higher tax rates. They note that their ability to boost local taxes is impeded further by a dearth of high-value properties combined with limitations on yearly property tax increases imposed pursuant to the Taxpayer Relief Act. *See* Brief for Appellants at 21.

More generally, Plaintiffs offer that education-related equal protection challenges are ordinarily justiciable because courts are able to discern from the established method

of raising and distributing funds whether less-affluent school districts are subject to inferior treatment as compared to wealthier ones. They continue that this may be accomplished without delving into questions of funding "adequacy" or otherwise implicating the *Baker* factors. As an example, Plaintiffs suggest a hypothetical example in which the state arbitrarily allocates a higher sum to wealthy districts than to poor ones. *See* Brief for Appellants at 23. Therefore, Plaintiffs contend that *Marrero II*'s focus on determining what constitutes an adequate education and appropriate funding for such an education is immaterial to the present issue. They add that, in any event, the political question doctrine is disfavored where a claim involves an alleged infringement of individual rights – here, the right to receive an education. *See id.* at 23-24, 43-44; Reply Brief for Appellants at 8 n.5, 20 (quoting *Sch. Dist. of Wilkinsburg v. Wilkinsburg Educ. Ass'n*, 542 Pa. 335, 343, 667 A.2d 5, 9 (1995) (stating that, under the Education Clause, public education is a "fundamental right" in Pennsylvania)). Finally, Plaintiffs reference decisions from other states in which an education-funding equal protection challenge was sustained on its merits. *See* Brief for Appellants at 25.

The Executive Defendants respond that Plaintiffs' Equal Protection Clause claim is intertwined with their Education Clause claim. They assert, as well, that the Petition's allegations do not support Plaintiffs' contention that determining what constitutes an adequate education is unnecessary within the equal protection context; they state that such allegations are, instead, framed in terms of an equal opportunity to obtain an "adequate" education. More generally, the Executive Defendants maintain that the framers considered the potential for inequalities between school districts, but they specifically rejected uniform funding in favor of local control. Thus, the Executive Defendants reason that it would be illogical to hold that the Equal Protection Clause

"forbids what the Education Clause was specifically designed to permit[.]"  Brief for Executive Appellees at 32.

They also contend that Plaintiffs misconstrue *Danson*, which held that the appellants failed to state a justiciable cause of action without distinguishing between the Equal Protection and Education Clause claims raised.  They remark, moreover, that no authority exists for Plaintiffs' position that the political question doctrine does not apply to equal protection claims, noting that *Baker* itself involved an equal protection challenge.  Lastly, as to whether education is a fundamental right, the Executive Defendants argue that the statement to this effect in *Wilkinsburg* is mere *dicta*.  They observe that the *Wilkinsburg* Court did not reach the merits of the issue raised in that dispute, which involved a challenge to a school board's authority to enter into a contract with a private company; the Court instead simply held that the trial court had erred by issuing a preliminary injunction without first holding an evidentiary hearing.

The Legislative Defendants also disagree with Plaintiffs as regards the *Danson* decision, suggesting that its holding – that the judiciary may not intrude upon an education funding scheme that bears a reasonable relation to complying with the Education Clause – applies to Plaintiffs' equal protection claim.  As well, they disagree that *Danson* reached the merits of the question raised, observing that *Danson*, like the Commonwealth Court in the present matter, dismissed the case on preliminary objections.  They also raise several alternative arguments, asserting, for example, that the equal-protection claim is conceptually deficient because it fails to identify a statutory classification.  *See* Brief for Legislative Appellees at 44-52.

Plaintiffs' argument is not based on the Fourteenth Amendment's Equal Protection Clause, but on Article III, Section 32 of the state charter.  That section

prohibits special laws regulating the affairs of school districts. *See* PA. CONST. art. III, §32(1); *see also supra* note 4.[20]

Pennsylvania courts do not, as a rule, decline to reach the merits of Section 32-based challenges to laws regulating education. *See, e.g.*, *W. Mifflin Area Sch. Dist. v. Zahorchak*, 607 Pa. 153, 164-65, 4 A.3d 1042, 1049 (2010) (sustaining an Article III, Section 32 challenge to a state law enacted to aid a single school district); *Harrisburg Sch. Dist. v. Zogby*, 574 Pa. 121, 141, 828 A.2d 1079, 1091 (2003) (rejecting, on its merits, an Article III, Section 32 challenge to an act designed to aid a small, but open, class of school districts). Here, Plaintiffs' contention does not rest on Section 32's preclusion of special laws as such. Instead, it is based on the provision's more general guarantee, as developed through judicial interpretation, that the citizens of this state enjoy equal protection under the law. *See Pa. Tpk. Comm'n v. Commonwealth*, 587 Pa. 347, 363, 899 A.2d 1085, 1094 (2006). In this sense, although Plaintiffs' position is not expressly based on federal equal protection guarantees, it is similar to an equal-protection claim brought under the Fourteenth Amendment. *See supra* note 4.

In reference to such claims, where the challenged governmental action does not restrict "fundamental" or "important" rights and does not burden a suspect or a quasi-suspect classification, it does not violate the Equal Protection Clause as long as it is rationally related to a legitimate governmental interest. *See Small*, 554 Pa. at 615, 722 A.2d at 672. However, if a statutory classification disadvantages a suspect class or

---

[20] Article I, Sections 1 and 26 have been identified as constituting the other equal protection provisions of the Pennsylvania Constitution. *See Klein v. SERS*, 521 Pa. 330, 344-45, 555 A.2d 1216, 1223 (1989). Here, however, Plaintiffs rely only on Article III, Section 32.

burdens a fundamental right, it will only be sustained if it survives strict scrutiny.  *See Smith v. Coyne*, 555 Pa. 21, 29, 722 A.2d 1022, 1025 (1999).[21]

## A. The fundamental-right/strict-scrutiny argument

Plaintiffs' argument implicates two conceptual bases for equal protection scrutiny. The first rests on the premise that education is a fundamental constitutional right which has been unduly burdened by insufficient funding; thus, any statutory classification must be subjected to strict scrutiny.  Regardless of whether Plaintiffs' description of education as a "fundamental" right is valid in a general or colloquial sense, from a legal perspective – that is, in terms of the applicable level of judicial scrutiny – it cannot be supported.  As this Court observed in *Danson*, the *Rodriguez* Court specified that

> the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing.  Nor is it to be found by weighing whether education is as important as the right to travel.  Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution.

*Rodriguez*, 411 U.S. at 33, 93 S. Ct. at 1297.  *Rodriguez* continued that education is not among the rights expressly protected by the United States Constitution, and that its "undisputed importance" cannot alone supply a "basis for saying it is implicitly so protected."  *Rodriguez*, 411 U.S. at 35, 93 S. Ct. at 1297; *see also Plyler v. Doe*, 457

---

[21] Under strict scrutiny a classification must be narrowly tailored to a compelling state interest.  *See D.P. v. G.J.P.*, ___ Pa. ___, ___, 146 A.3d 204, 210 (2016). Classifications which are "quasi-suspect" (sometimes referred to as "sensitive"), trigger an intermediate level of review in which the classification must be substantially related to an important government interest.  *See Commonwealth v. Bell*, 512 Pa. 334, 344-45, 516 A.2d 1172, 1178 (1986) (summarizing the three levels of scrutiny under Pennsylvania law).

U.S. 202, 223, 102 S. Ct. 2382, 2398 (1982) (acknowledging that education is not a fundamental right under the federal Constitution).

Similarly, Article I of the Pennsylvania Constitution, known as the Declaration of Rights, enumerates various rights and freedoms as being inherent to mankind, including life, liberty, property, and reputation. *See* PA. CONST. art. I, §1; *see also id.* §§3-10 (listing other rights such as religious freedom, the right to vote, trial by jury, freedom of expression, freedom from unreasonable searches and seizures, and rights associated with criminal defendants).[22] Article I rights are carved out of the government's general powers, *see id.* §25, and, being inherent, they are secured rather than bestowed by the Constitution. *See Driscoll v. Corbett*, 620 Pa. 494, 511, 69 A.3d 197, 208 (2013).[23]

Although there cannot be any doubt that education is of vital social importance to the Commonwealth of Pennsylvania, from a *constitutional* standpoint the Education Clause stands on a different footing in terms of individual rights. The text of that clause lacks any language indicating that a right to education is either granted to the people or inherent to mankind. *Cf. Robinson Twp.*, 623 Pa. at 607, 83 A.3d at 927 (noting that the Legislature's Article III duties are "limited fundamentally" by the rights "reserved to the people" in Article I). Also, Article I does not itself mention education, nor does any other aspect of the state charter suggest that a free public education was intended by the framers to be a fundamental right. It is not within this Court's purview to declare it so based on our own estimation of its critical social importance. *See generally Rodriguez,*

---

[22] This list is not meant to be exclusive.

[23] I do not mean to suggest that any and all burdens upon Article I rights must be justified by a compelling state interest. *See generally Robinson v. Cahill*, 303 A.2d 273, 282 (N.J. 1973) (criticizing the concept that the burdening of fundamental rights as defined in *Rodriguez* should always invoke strict scrutiny).

411 U.S. at 33, 93 S. Ct. at 1297 ("It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection[.]").

Moreover, *Marrero II* stated expressly that the Education Clause does not confer individual rights upon students, but rather, imposes a duty on the Legislature. *See Marrero II*, 559 Pa. at 17, 739 A.2d at 112. Thus, to the extent an individual right to public education exists in Pennsylvania, it is statutorily conferred and, as such, "it is limited by statutory provisions." *Lisa H. v. State Bd. of Educ.*, 67 Pa. Cmwlth. 350, 356, 447 A.2d 669, 673 (1982), *aff'd per curiam*, 502 Pa. 613, 467 A.2d 1127 (1983); *accord* 24 P.S. §13-1301. Notably, there is no present claim before this Court that a statutory violation has occurred.

As for the tension between *Marrero II* and *Wilkinsburg*, the former rejected an explicit request for a declaratory judgment stating that the Education Clause confers an individual right to a thorough and efficient system of education. *See Marrero I*, 709 A.2d at 958. Thus, in *Marrero II* the constitutional issue was joined and a holding was reached. By contrast, *Wilkinsburg*'s indication that education constitutes a fundamental right comprised *dicta* unsupported by authority.[24] I would now disapprove that statement and hold, consistent with *Marrero II*, that the Education Clause imposes an

---

[24] As the Executive Defendants observe, individual rights in education were not at issue in *Wilkinsburg*. The underlying dispute related to whether a school board could contract with a private company to operate a school. The issue directly before the Court was whether an evidentiary hearing was needed before a preliminary injunction could issue in favor of the plaintiff union. A responsive opinion which garnered majority support clarified that, per the doctrine of constitutional avoidance, the Court's ruling was limited to remanding for such a hearing so that any statutory or constitutional questions which may arise could be resolved by the common pleas court on a developed record. *See Wilkinsburg*, 542 Pa. at 346, 667 A.2d at 10 (Zappala, J., concurring). Finally, the only purpose served by the majority's *sua sponte* declaration that education is a fundamental right was to bolster its directive that, on remand, the best interests of the students should serve as the polestar of the county court's ultimate decision as to whether to grant the union's request for a preliminary injunction.

obligation on the Legislature, but it does not confer a fundamental constitutional right upon individuals capable of triggering strict scrutiny within an equal protection context.[25]

Moreover, Plaintiffs do not assert that the government has burdened a suspect class. *See D.P.*, ___ Pa. at ___ n.8, 146 A.3d at 210 n.8 ("Strict scrutiny is separately triggered under the Equal Protection Clause if the legislation employs a suspect classification."). The Petition's averments suggest that, to the extent a class exists, it is comprised of a number of low-wealth school districts which are unable to raise as much money through taxation as other school districts. *See, e.g.*, Petition ¶287 (alleging that the 2011 funding cuts and dependence on local taxes have disproportionately impacted the state's 50 poorest districts). Thus, the purported class is based on wealth and geography. *See id.* ¶8 (alleging that the funding system violates equal protection "because it turns the caliber of public education into an accident of geography").

These types of identifying characteristics do not give rise to a suspect or quasi-suspect classification. *See Small*, 554 Pa. at 615 nn.14-15, 722 A.2d at 672 nn.14-15

---

[25] *Accord, e.g.*, *Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1016-19 (Colo. 1982); *McDaniel v. Thomas*, 285 S.E.2d 156, 166-67 (Ga. 1981); *Bd. Of Educ. of Cincinnati Sch. Dist. v. Walter*, 390 N.E.2d 813, 817-19 (Ohio 1979); *cf. Kukor v. Grover*, 436 N.W.2d 568, 579 (Wis. 1989) (determining that an "equal opportunity for education" is a fundamental right under the state's education clause, but holding that the state's education funding system was subject to rational basis review); *Skeen v. State*, 505 N.W.2d 299, 313 (Minn. 1993) (similarly finding that education is a fundamental right under the state charter and, while strict scrutiny should apply "in determining whether the legislature has met a student's fundamental right to a general and uniform *system* of public schools, a lesser standard, such as a rational basis test, should apply to the determination of whether the *financing* of such a system is 'thorough and efficient.'"). *But see, e.g.*, *Washakie Cnty. Sch. Dist. No. 1 v. Herschler*, 606 P.2d 310, 333-35 (Wyo. 1980) (expressing that because education is a fundamental right under the state constitution, the government's funding scheme must satisfy strict scrutiny); *Pauley v. Kelley*, 255 S.E.2d 859, 878 (W. Va. 1979) (same); *Seattle Sch. Dist. No. 1 of King Cnty. v. State*, 585 P.2d 71, 91 (Wash. 1978) (same where the state charter prioritized education over other legislative obligations by expressly making it the legislature's "paramount duty").

(observing that suspect classes are race, national origin, and, for state-law purposes, alienage, and that quasi-suspect classes are gender and legitimacy). Because no fundamental right or suspect class is involved, I would conclude that Plaintiffs cannot prevail on their contention that, to be valid, the purported classification must survive strict scrutiny, *i.e.*, be justified by a compelling government interest and be narrowly tailored to serve that interest.

## B. The no-rational-basis argument

In the alternative, Plaintiffs maintain that, even if strict scrutiny does not apply, the manner in which the Legislature funds public education fails the more deferential rational basis test because it is arbitrary and irrational. *See* Petition ¶305 (describing the "levels and allocation" of state public-school funding as "irrational, arbitrary, and not reasonably calculated to ensure that all Pennsylvania school children have access to an adequate education"). Under the rational-basis framework, the question is whether the legislative classification is rationally related to the promotion of a legitimate state interest. *See Kramer v. WCAB (Rite Aid)*, 584 Pa. 309, 335, 883 A.2d 518, 534 (2005). *See generally* Brief for Appellants at 26 (implying that the school funding scheme does not "serve[] a legitimate government interest").

Although, as noted, there is no *per se* rule against reaching the merits of an Article III, Section 32 challenge to state laws regulating education, I agree with Defendants' suggestion that, here, the claim is intertwined, or "enmeshed," with the Education Clause claim. Brief for Legislative Appellees at 24 n.9; *see also* Brief for Executive Appellees at 31 (asserting that the two claims cannot be "disentangled"). The Supreme Court has recognized that an equal protection claim is not justiciable if, in substance, it is enmeshed with "political question elements" which cause claims under a separate constitutional provision to implicate the political question doctrine. *Baker*, 369

U.S. at 227, 82 S. Ct. at 715. For its part, *Baker* held that the one-man-one-vote equal-protection claim raised in that matter was not enmeshed with the political question elements involved in a cause of action brought under the Article IV, Section 4, known as the Guaranty Clause. *See* U.S. CONST. art. IV, §4 (guaranteeing to each state a republican form of government); *Baker*, 369 U.S. at 232, 82 S. Ct. at 718. *Baker* noted, however, that 50 years earlier the Court did recognize such an entanglement in *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 32 S. Ct. 224 (1912).

In *Pacific States*, a corporation challenged a tax levied by popular initiative, a process that had been included in the Oregon charter via constitutional amendment several years earlier. The company claimed that the initiative process itself was contrary to the Guaranty Clause, and that as such, the tax violated several other constitutional rights, including the right to equal protection. The Supreme Court denied relief. It expressed that the latter contention rested on a preliminary finding that the initiative procedure violated the Guaranty Clause, which in turn implicated a non-justiciable claim. As a consequence, the equal protection cause of action was deemed non-justiciable. *See id.* at 150-51, 32 S. Ct. at 231. *See generally Cantor v. Supreme Court of Pa.*, 353 F. Supp. 1307, 1316-17 (E.D. Pa. 1973) (comparing the analyses in *Baker* and *Pacific States*).

A review of the Petition here indicates that the averments relating to equal protection are framed in terms of whether the students in poorer school districts have been denied an equal opportunity to obtain an "adequate" education. *See* Petition ¶¶8, 13, 94, 262, 290-92, 308-10, 313-14, 317, 320-21. Addressing that question requires a prior agreement that the premise – that the lower total expenditures per student in the poorer districts were depriving the students in those districts of an adequate education – is susceptible of judicial determination. Given my earlier conclusion that the

ascertainment of what constitutes a constitutionally adequate education is a matter of public policy left to the political branches and lies outside the realm of the judiciary, I would find that, as in *Pacific States*, the equal-protection claim as stated here is enmeshed with the initial, non-justiciable, claim.

Still, Plaintiffs argue that, regardless of the wording in the Petition, their equal protection argument, in fact, rests solely on disparities in funding as between poorer and wealthier districts, and not on the premise that students in poorer districts are failing to receive an "adequate" education. They suggest the alleged equal protection violation arises solely from the fact that poorer school districts have less total education funding, meaning students in those districts are receiving an inferior education. *See* Brief for Appellants at 22. Also, according to Plaintiffs, the complained-of funding discrepancies are due to legislative choices because, under state law, the overall funding arrangement relies heavily on local taxes.[26] For the sake of decision, I would afford Plaintiffs the benefit of any doubt on this question and consider their equal protection claim on the terms they now advance. Stated thus, the question is justiciable and its substance can be analyzed without reference to the concept of educational adequacy.

Legislation duly enacted by the General Assembly enjoys a strong presumption of validity. It will only be declared void if it clearly, palpably, and plainly violates the Constitution. Any doubts about its validity are resolved in favor of a finding of constitutionality. *See Commonwealth v. Bullock*, 590 Pa. 480, 487, 913 A.2d 207, 211-

---

[26] Plaintiffs argue that the General Assembly is to blame for the additional reason that that body draws school district boundaries and decides what types of properties, business transactions, and services may be locally taxed. S*ee* Petition ¶289. The Supreme Court has rejected an identical argument. *See Rodriguez*, 411 U.S. at 53-54, 93 S. Ct. at 1307 (noting that the existence of local government units requires the drawing of arbitrary boundaries, and the amount of taxable wealth within those boundaries will invariably differ, fluctuate, and depend on the decisions of actors other than state officials, including local officials, local residents, and private enterprises).

12 (2006). The overall question for purposes of a Defendants' demurrer is whether the Petition's averments are legally sufficient to state a claim for relief. *See* Pa.R.C.P. No. 1028(a)(4); *Mazur v. Trinity Area Sch. Dist.*, 599 Pa. 232, 240, 961 A.2d 96, 101 (2008). As applied here, the issue is whether such averments identify a statutory classification which bears no rational relationship to a legitimate state interest.

As discussed, the classification identified in the Petition involves geography and wealth. It consists of a group of school districts which have a diminished ability to raise local revenues as compared to wealthier districts. If the school financing arrangement were to discriminate against these districts, for example, by allocating less state money to them due to their lower wealth (as in the hypothetical example Plaintiffs propose), such discrimination would clearly be unrelated to a legitimate government interest.

According to the Petition, however, the state uses a formula which provides *more* aid to poorer districts than to wealthier ones. *See* Petition ¶¶262-67. This is entirely rational: such districts need more aid than wealthier ones, and the provision of more money rationally relates to the legitimate governmental interest in lessening the funding disparity between the two groups of school districts and helping poorer districts with costs associated with disadvantaged students. While the Petition alleges that the state should provide even more aid than it currently does, *see* Petition ¶11 ("Although the state has made some effort to close that gap, contributing twice as much per student to Panther Valley as it did to Lower Merion, that still left Panther Valley with less than half the combined state and local funding of Lower Merion[.]"), the government's failure to do so does not suggest it is treating poorer districts in an inferior manner to wealthier ones or that its funding formula is not rationally to a legitimate state interest.

Insofar as the claim is based on the predicate that the statutory scheme depends too heavily on local tax revenue, our precedent and that of the United States Supreme

Court establish that the government has a rational basis for relying to a large degree on such revenue as a means of conforming with the framers' intent to maintain local decisional authority over the affairs of school districts.[27] The Petition discounts such local authority as "illusory" under the current arrangement because poorer school districts do not control the standards to which their students are held or the amount of money at their disposal. Petition ¶¶9, 294. Such a contention, even if accepted as true, speaks to a circumstance – possibly a temporary one in light of recent legislation such as Act 35 – which does not undermine the validity of the state's overall interest in preserving such oversight at the local level. I do not disallow that some school districts, especially poorer ones, may be willing to sacrifice local control for more state funding. Again, however, such a circumstance, even if proved, would not speak to the legitimacy of the government's overall interest as it pertains to school districts generally.

I would conclude, then, that the averments in the Petition are legally insufficient to make out a viable cause of action under the Equal Protection Clause – and, consequently, that the Commonwealth Court acted properly in sustaining Defendants' demurrer to that count of the Petition.

---

[27] *See Danson*, 484 Pa. at 427, 399 A.2d at 367; *see also Wright v. Council of City of Emporia*, 407 U.S. 451, 469, 92 S. Ct. 2196, 2206 (1972) ("Direct control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society[.]"); *Papasan v. Allain*, 478 U.S. 265, 284-85, 106 S. Ct. 2932, 2943-44 (1986) (acknowledging the state has a rational interest in accommodating two separate forces via a funding system involving local and state elements: society's desire that all children receive an education, and parents' desire that their own children receive the best affordable education); *Rodriguez*, 411 U.S. at 51-53 & n.109, 93 S. Ct. at 1306-07 & n.109 (explaining how local funding allows for the retention of local decision-making). *See generally Rodriguez*, 411 U.S. at 48-51 & nn.102-08, 93 S. Ct. at 1304-06 & nn.102-08 (discussing the history and importance of local decision-making in the public-education arena).

## IV. Conclusion

For the foregoing reasons, I would affirm the order of the Commonwealth Court. Accordingly, I respectfully dissent.